

FILED
OCT - 8 2003
TERESA L. DEPPNER, CLERK
U.S. District & Bankruptcy Courts
Southern District of West Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

SCOTT W. ANDREWS and
PAUL TALLMAN, SR.

Plaintiffs,

v.

Civil Action No. 2:03-2237
(Civil Action No. 01-C-4090
Circuit Court of Kanawha Co.
Judge Walker)

CITY HOLDING COMPANY, CITY NATIONAL BANK OF WEST VIRGINIA, JACK ALLEN, JACK BAZEMORE, SAMUEL BOWLING, PHILLIP CAIN, D.K. CALES, MATTHEW CALL, HUGH CLONCH, OSHEL CRAIGO, STEVEN DAY, WILLIAM DOLIN, WILLIAM FILE, ROBERT D. FISHER, SCOTT GIBSON, JAY GOLDMAN, ROBERT GRIST, DAVID HADEN, DAVID HAMBRICK, FRANK HARKINS, CARLIN HARMON, ROBERT HENSON, TRACY HYLTON, II, CAROL KABLE, C. DALLAS KAYSER, BARRY KEMERER, JACK KLIM, THOMAS LILLY, TIMOTHY MANCHIN, CLARENCE MARTIN, CURTIS McCALL, PHILLIP McLAUGHLIN, HAROLD PAYNE, E.M. PAYNE, III, PAT REED, JAMES ROSSI, R.T. ROGERS, SHARON ROWE, MARK SCHAUL, MICHAEL SELLARDS, CHARLES SMITH, JAMES SONGER, ALBERT TIECHE, PAUL TURMAN, II, CECIL WILLIAMS, and MARY WILLIAMS,

Defendants.

**PETITION FOR AND NOTICE OF REMOVAL**
**<u>PURSUANT TO 28 U.S.C. § 1442(a)(1)</u>**

Now comes the United States of America ("United States"), Petitioner, by counsel, Stephen M. Horn, Assistant United States Attorney for the Southern District of West Virginia, and petitions

the Court for removal as follows, and hereby gives notice of said removal.

STATEMENT OF CASE

The United States understands that the action pending in the Circuit Court of Kanawha County is a shareholders action against City Holding Company, City National Bank, N.A. ("the Bank") and others. The Bank is an entity regulated by the Office of the Comptroller of the Currency ("OCC"). In the course of the state court proceeding, the United States understands that the Bank was served with certain discovery requests by plaintiffs which, in part, sought OCC documents, including OCC Reports of Examination ("ROE") of the Bank and other non-public information. The Bank initially objected to producing the OCC documents in its possession and a motion to compel was filed by plaintiff. The Bank then withdrew its objection, subject to the rights of the OCC, the owner of the requested documents (Ex. A). The OCC informed the Bank of its position on the production of the ROE documents by letter dated August 1, 2003 (Ex. A). A hearing was held on plaintiffs' motion to compel and the United appeared specially and argued its position in open court and in writing (Ex. B). Plaintiffs also responded to the United States written arguments by letter dated August 7, 2003 (Ex. C).

On August 14, 2003, the state court entered an Order requiring plaintiffs to request the sought after documents from the OCC

pursuant to 12 C.F.R. § 4.33 and deferred ruling on the Motion to Compel until such time as the OCC had issued its decision on that request (Ex. D).

On September 23, 2003, the OCC issued its final Agency Decision on plaintiff's request, which denied production of the requested documents (Ex. E). A copy of this Order was provided to the state court and counsel of record. At a hearing on the Motion to Compel held on October 8, 2003, at 8:30 a.m. before the Honorable Jennifer Bailey Walker, the Court entered an order requiring the Bank to produce the OCC documents (Ex. F).

REMOVAL JURISDICTION

Removal jurisdiction is predicated on 28 U.S.C. § 1442(a)(1), as the OCC ROE and other non-public documents in the Bank's possession or control are the lawful property of the OCC. (Ex. A). The state court's Order is an adverse action against the OCC which impedes and interferes with the OCC's ability to control the release of nonpublic information pursuant to its Touhy regulations and it directly challenges the sovereign immunity of the United States and the supremacy clause of the United States Constitution.

The state court's Order also violates the Administrative Procedures Act ("APA") and the Freedom of Information Act ("FOIA"). Accordingly, removal is appropriate pursuant to 28 U.S.C. § 1442(a)(1). Jefferson County, Alabama v. Acker, 527 U.S. 423 (1999); United States v. Todd, 245 F.3d 691 (8th Cir. 2001); COMSAT

Corp v. National Science Foundation, 190 F.3d 269 (4th Cir. 1999); Smith v. Cromer, 159 F.3d 875 (4th Cir. 1998), cert. denied, 528 U.S. 826 (1999); Boron Oil Co. v. Downie, 873 F.2d 67 (4th Cir. 1989); and Dent v. Packerland Packing Co. Inc., 144 F.R.D. 675 (D. Neb. 1992). Removal is appropriate even though the state court proceeding is not designated a civil or criminal action against the United States of America, a federal official, agency, etc. Maddox v. Williams, 855 F. Supp. 406, 409 (D.D.C. 1994), aff'd, Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 413-14 (D.C. Cir. 1995).

Accordingly, this action is properly removed to the District Court and the court should quash or vacate the state court order requiring the Bank to produce or disclose the OCC's ROE documents and other non-public documents. Plaintiffs' remedy is to appeal the Final Decision of the OCC to federal court pursuant to the APA. A copy of the state court docket sheet is attached hereto as Ex. G.

Respectfully submitted,

KASEY WARNER
United States Attorney

By:

STEPHEN M. HORN
Assistant United States Attorney
P.O. Box 1713
Charleston, WV 25326
(304) 345-2200



**U.S. Department of Justice** FILE COPY

*United States Attorney*
*Southern District of West Virginia*

*United States Courthouse*
*300 Virginia Street, East, Room 4000*
*Charleston, WV 25301*
*FAX: (304) 347-5443*

*Mailing Address*
*Post Office Box 1713*
*Charleston, WV 25326*
*(304) 345-2200*
*1-800-659-8726*

**BY HAND DELIVERY**
August 1, 2003

Honorable Jennifer Bailey Walker
Circuit Court of Kanawha County, West Virginia
111 Court Street, Judicial Annex
Charleston, WV 25301

Re: Tallman v. City National Bank of West Virginia
Civil Action No. 01-C-4090

Dear Judge Walker:

I am advised that there is a status conference scheduled in the above styled action on August 4, 2003, at 9:30 a.m., at which time argument will be heard with regard to the discovery commissioner's recommendations. One of the issues involved, as I understand it, is a request for production to City National Bank to produce certain Office of the Comptroller of the Currency ("OCC") audits. Those audits are nonpublic information which are the property of the OCC.

Enclosed is a letter fromt he OCC dated August 1, 2003, to Mark R. Smith, Jr., Esquire, who represents City National Bank, which outlines the OCC's position on the disclosure of these audit reports. Not only are the reports nonpublic information and the property of the OCC, but they are exempt from disclosure under the Freedom of Information Act. However, there is an administrative procedure by which plaintiff's can seek the release of the requested audit reports. See 12 C.F.R. § 4.31, et seq. I am advised that plaintiff's have not exhausted this administrative remedy.

I hope this letter is of benefit to you in resolving this issue. I anticipate attending the hearing to answer any further questions the court may have.

Sincerely yours,

KASEY WARNER
United States Attorney

By: [signature]
STEPHEN M. HORN
Assistant United States Attorney

SMH/cgb
Enclosure
cc: Martin R. Smith, Jr., Esq. (w/o encl., by fax and by mail)
Guy R. Bucci, Esq. (w/o encl., by fax and by mail)

GOVERNMENT EXHIBIT
A

SMITH & THOMPSON
ATTORNEYS AT LAW
900 LEE STREET
HUNTINGTON SQUARE, SUITE 804
CHARLESTON, WV 25339
(304) 343-6383 FACSIMILE (304) 343-6839

July 29, 2003

Ford Barrett
Assistant Director
Litigation Division
OCC
Washington, D.C. 20219

Re: Tallman v. City National Bank of WV

Dear Mr. Barrett:

This will confirm our recent telephone conversation concerning the above-referenced matter. In addition, pursuant to your request, I have enclosed the Motion To Compel which was previously filed in this matter, as well as, the recommendations of the Discovery Commissioner in this matter.

In addition, as you will note, the Court has scheduled a hearing for August 4th at 9:30 a.m. in the Circuit Court of Kanawha County, West Virginia, at which time an argument will be had with regard to the Discovery Commissioner's recommendation. At this point, I am unsure as to whether the OCC issue will be dealt with, however, I invite your office to attend that hearing if you believe it is prudent.

If you should have any questions in this regard, please do not hesitate to call me.

Very truly yours,

Martin R. Smith, Jr.

MRS:ljg



Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

August 1, 2003

Martin R. Smith, Jr., Esq.
Smith & Thompson
900 Lee Street
Huntington Square, Suite 804
Charleston, West Virginia 25339

Re: Tallman v. City Holding Co., No. 01-C-4090 (Kanawa Cty Cir. Ct., W. Va.)

Dear Mr. Smith:

This acknowledges your letters of July 16 and July 29 notifying the OCC that the plaintiff in the above referenced litigation has filed a motion to compel City National Bank of West Virginia, Charleston, West Virgina, and its affiliates to produce OCC examination reports and other non-public OCC information on the bank.

For several reasons, we are quite concerned about the plaintiff's motion, and we urge you to relay our concerns to the court. First, federal law prohibits City National Bank and its affiliates from producing OCC examination reports without OCC approval. An examination report is non-public OCC information, as that term is defined in 12 C.F.R. § 4.32(b). As such, the examination report "is the property of the Comptroller [and] is loaned to the bank or holding company for its confidential use only." 12 C.F.R. § 4.32(b)(2). Further,

> Without OCC approval, no person, national bank or other entity, including one in lawful possession of non-public OCC information under paragraph (b)(2) of this section, may disclose information covered by this subpart in any manner, except: (A) After the requester has sought the information from the OCC pursuant to the procedures set forth in this subpart; and (B) As ordered by a Federal court in a judicial proceeding in which the OCC has had the opportunity to appear and oppose discovery.

12 C.F.R. § 4.37(b). The federal regulation goes on to provide that "Any person who discloses or uses non-public OCC information except as expressly permitted by the Comptroller of the Currency or as ordered by a Federal court . . . may be subject to the penalties provided in 18 U.S.C. 641." 12 C.F.R. § 4.37(b)(1)(ii).

Second, OCC examination reports are both expressly exempt from the mandatory disclosure provisions of the Freedom of Information Act, 5 U.S.C. § 552(b)(8), and privileged under the bank examination privilege. As two federal appellate courts have explained, the privilege serves "to preserve candor in communications between bankers and examiners" and is "essential to the effective supervision of banking institutions." In re Bankers Trust Co., 61 F.3d 465, 471 (6th Cir. 1995), citing In Re Subpoena Served Upon the Comptroller of the Currency, 967 F.2d 630, 633 (D.C. Cir. 1992). Since the examination report is OCC property, the privilege belongs to the OCC. First Eastern Corp. v. Mainwaring, 21 F.3d 465, 468 (D.C. Cir. 1994).

Third, the plaintiffs have failed to exhaust their administrative remedies before the OCC. To assist private litigants like the plaintiffs here, the OCC and the other federal bank regulatory agencies (Federal Reserve Board, FDIC, OTS) have promulgated regulations allowing a party to make application to the agency for non-public information. See 12 C.F.R. § 4.31 *et seq*. The proper course of action here is for the plaintiffs to exhaust their administrative remedies by seeking the documents from the OCC under this regulation. To do this, the plaintiffs should write to the OCC's Director of Litigation at the address in 12 C.F.R. § 4.34(a) and make the showings required by 12 C.F.R. § 4.33(a)(3) (especially, showings as to relevance, availability of alternative evidence, and need). As is our custom, the OCC's decision will be a final agency decision that a federal court can review if called upon to do so. This very process is codified at 12 C.F.R. § 4.37(b)(1), which authorizes production after the requester has sought the information from the OCC under this regulation and a federal court has so ordered in a proceeding in which the OCC appeared and explained its decision.

Fourth, a state court has no authority to order the production of federal property such as the OCC's examination reports. Under the Supremacy Clause of the U.S. Constitution, a state court must allow federal law to prevail over state rules of civil procedure that would otherwise authorize the state court to order production. In a virtually identical situation, a federal court issued an injunction against a state court judge "from attempting to coerce First Federal Savings and Loan Association, through the use of any sanction authorized by Rule 37, Arizona Civil Procedure, into disclosing any examination reports prepared by examiners of the federal Home Loan Bank Board." Federal Home Loan Bank Board v. Superior Court of the State of Arizona, 494 F. Supp. 924, 927 (D. Ariz. 1980).

Finally, the Motion to Compel indicates that the bank produced, apparently inadvertently, an OCC examination report dated November 1996 without OCC permission under 12 C.F.R. § 4.31 *et seq*. The court should order the plaintiffs to return the examination report or to apply to the OCC under 12 C.F.R. § 4.31 for permission to use it. In the same situation, a federal court recently ordered the party in possession of the OCC examination report to make application to the OCC for permission to use it. Raffa v. Wachovia Corp., 242 F. Supp. 2d 1223, 1225 (M.D. Fla. 2002).

For the court's use, I am enclosing the following decisions that support the points above: Raffa v. Wachovia, *supra*; First National Bank of Florida v. Austin, No. 96-1790-CA-01-CON (Santa

Rosa Cty, Florida, June 19, 1997) ); and Long v. ACE Cash Express, Inc., No. 2000-837-CA (Clay Cty Cir. Ct, Florida, Aug. 27, 2002).

Please notify me of the court's decision on plaintiff's motion to compel.

Sincerely,

L. Robert Griffin
Director
Litigation Division

Enclosures
cc: Steve Horn, Esq.
Assistant United States Attorney

1. Defendants, MRA Holding, LLC d/b/a MRA Video's and Ventura Distribution, Inc.'s, Motion for Final Summary Judgment (Doc No. 47), filed on July 8, 2002 is **GRANTED.**

2. Defendant, Point.360 d/b/a Woodholy Productions, Inc.'s, Dispositive Motion for Final Summary Judgment (Doc. No. 54), filed on July 17, 2002 is **GRANTED.**

3. Defendant, Mantra Films, Inc.'s, Dispositive Motion for Final Summary Judgment (Doc. No. 72), filed on August 12, 2002 is **GRANTED.**

4. Defendant, AMX Productions, LLC's, Motion for Partial Summary Judgment as to Count VII of the Amended Complaint (Doc. No. 90), filed on September 30, 2002 is **GRANTED.**

5. Plaintiff, Veronica Lane's, Motion for Partial Summary Judgment on the Issue of Capacity to Consent and Supporting Memorandum of Law (Doc No. 62), filed on July 29, 2002 is **DENIED.**

6. Final judgment will be entered on these claims at the conclusion of this case.

7 The Clerk shall terminate MRA Holding, LLC d/b/a MRA Video, Ventura Distribution, Inc., Point.360 d/b/a Woodholly Productions, Inc., and Mantra Films Inc., as parties in this matter.

8. Only the fraud Count (Count VIII) asserted against Defendant, AMX Productions, LLC, remains in this case.

**Mathew Benedict RAFFA, et al., Plaintiffs,**

**v.**

**WACHOVIA CORPORATION, Defendant.**

**No. 8:02CV1443-T-27-EAJ.**

United States District Court, M.D. Florida, Tampa Division.

Nov. 27, 2002.

Former shareholder, who sold his shares in acquired corporation pursuant to merger agreement, brought putative class action against acquiring corporation. Acquiring corporation moved to strike former shareholder's references to, to compel return of, and to bar publication of documents of United States Office of the Comptroller of the Currency (OCC) pertaining to acquiring corporation. The District Court, Jenkins, United States Magistrate Judge, held that shareholder was required to request access to OCC's non-public documents pursuant to administrative procedures.

Ordered accordingly.

**1. Federal Civil Procedure ⇨1554**

Former shareholder of acquired corporation was required first to request access to non-public documents of United States Office of the Comptroller of the Currency (OCC) pertaining to acquiring corporation through administrative procedures established by regulation, in putative class action arising from merger, inasmuch as determination of discoverability of such

documents by district court would be premature until after OCC decided whether it would release documents through administrative process; thus, acquiring corporation was not entitled to order granting its motion to strike former shareholder's references to, to compel return of, and to bar publication of OCC documents in shareholder's possession. 12 C.F.R. §§ 4.33(3), 4.37(b).

2. Witnesses ⇐216(1)

Bank examination privilege shields from discovery only agency opinions or recommendations; it does not protect purely factual material.

3. Witnesses ⇐216(1)

Bank examination privilege belonged to the United States Office of the Comptroller of the Currency (OCC) in action raising issues of discovery and disclosure of OCC documents.

---

Guy M. Burns, Jonathan S. Coleman, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Tampa, FL, for Plaintiff.

A. Alexander Rhodes, Carlton Fields, P.A., Tampa, FL, Gary Lee Sasso, John L. Badalmenti, Carlton Fields, P.A., St. Petersburg, FL, for Defendant.

## ORDER

JENKINS, United State Magistrate Judge.

Before this Court is the Defendant's Motion To Strike References To, And To Compel Return Of, Federally Protected Documents (Dkt.13), filed on October 15, 2002, and Opposition To Wachovia's "Motion To Strike References To, And To Compel Return Of, Federally Protected Documents" (Dkt.30), filed on November 1, 2002.

*Background*

On June 1, 2000, Plaintiff sold his Commerce National shares pursuant to an "Agreement and Plan of Merger" ("Agreement") between Commerce National Corporation ("Commerce") and Wachovia Corporation ("Defendant").

Plaintiff alleges Defendant withheld from Plaintiff adverse information about Defendant's financial status. Defendant had a reserve deficiency which led Wachovia to announce on June 14, 2000, a $200 million dollar charge against its earnings. The charge precipitated a 20% decline in Defendant's stock value.

Plaintiff alleges that, had the information been disclosed earlier, he would have received a more favorable exchange rate for his shares of Commerce.

He filed this lawsuit on behalf of himself and similarly situated shareholders of Commerce who sold their shares pursuant to the Agreement. The class has not yet been certified.

In another pending case in this District, 8:01-CV-1041-T-17-MAP, Frederick A. Raffa, father of the named Plaintiff in this case and represented by the same counsel, requested the production of United States Office of the Comptroller of the Currency ("OCC") examination reports of the Defendant for 1998 through 2000 from the Defendant on April 9, 2002. Defendant refused to disclose the information and provided no privilege log.

Rather, Frederick A. Raffa received some OCC documents from the Defendant's auditors Ernst & Young, including

References To, And ... Of, Federally Protect... .30), filed on November ...

0, Plaintiff sold his Com... shares pursuant to an ... Plan of Merger" ("Agree... Commerce National Cor... erce") and Wachovia Cor... ant").

...s Defendant withheld ... verse information about ... ncial status. Defendant ... ciency which led Wacho... n June 14, 2000, a $200 ... rge against its earnings ... itated a 20% decline in ... value.

... that, had the informa... d earlier, he would have ... favorable exchange rate ... ommerce.

suit on behalf of himself ... uated shareholders of ... ld their shares pursuant ... The class has not yet ...

ing case in this District, 7–MAP, Frederick A. ... named Plaintiff in this ... ed by the same counsel, ... uction of United States ... troller of the Currency ... on reports of the De... hrough 2000 from the ... il 9, 2002. Defendant ... the information and ... e log.

...k A. Raffa received ... ents from the Defen... ...st & Young, including

Supervisory Letter 00–09 ("Letter") dated December 8, 2000, signed by National Bank Examiner Tommy D. Fuller.

Plaintiffs filed an amended complaint in that case, reflecting the information obtained from Ernst & Young.

In this case, Plaintiff's complaint included a discussion concerning information from Ernst & Young as well as a copy of some of the documents, attached as Exhibit 6 to Plaintiff's complaint.

Defendant moves to strike references to the documents, to compel their return to Defendant, and to bar Plaintiff from further use or publication of the documents.

Discovery deadline has not been set in this case. The Preliminary Pretrial Conference is set for December 13, 2002.

*Analysis*

[1] The Code of Federal Regulations address the release of such OCC information such as those contained in these documents. *See* 12 C.F.R. § 4.31 *et seq.* The Regulations define such information as confidential and non-public, even if in the lawful possession of another individual or entity. *See* 12 C.F.R. § 4.32(b)(i) and (iii).

The Regulations require that, without OCC approval, no person, including one in lawful possession of non-public OCC information, may disclose the information except after that person has sought and obtained permission from the OCC or as ordered by a federal court. *See* 12 C.F.R. §§ 4.36(d) and 4.37(b)(1)(i).

[2, 3] Such documents have generally been protected by a qualified bank examination privilege. *In re: Subpoena Served Upon Comptroller of the Currency and Secretary of the Board of Governors of the Federal Reserve System,* 967 F.2d 630, 633–34 (D.C.Cir.1992). The bank examination privilege shields from discovery only agency opinions or recommendations; it does not protect purely factual material. *Id.* at 634 (citations omitted). This privilege belongs to the OCC. *First Eastern Corp. v. Mainwaring,* 21 F.3d 465, 468 (D.C.Cir.1994).

Defendant has attached to its Motion a copy of a letter from Ford Barrett, the Assistant Director of the Litigation Division of the OCC. The Ford letter suggests Plaintiff return the examination report to the OCC and then apply to the OCC for access to it. The OCC has not yet asked to intervene in this case.

However, under 12 C.F.R. § 4.37(b), Plaintiffs are required to request non-public OCC documents through the administrative procedures set forth in 12 C.F.R. § 4.33(3).

*Conclusion*

A determination of discoverability is premature pending a determination by the OCC whether they will release the information through the established administrative process. Therefore, within twenty days, Plaintiff shall request the information through the process as set forth in 12 C.F.R. § 4.33(3).

Plaintiff and Defendant will submit a confidentiality order to govern the information at issue until a decision is rendered by the OCC.

If, after sixty-one days following the Plaintiff's request, the OCC refuses to allow Plaintiff to use the information, Plaintiff and Defendant may resubmit arguments regarding the discoverability of the OCC material on proper motion.

Upon consideration, it is **ORDERED** and **ADJUDGED:**

(1) **Defendant's Motion To Strike References To, And To Compel Return Of, Federally Protected Documents** (Dkt.18) is **DENIED;**

(2) Plaintiff shall request the OCC information through the administrative procedure set forth in 12 C.F.R. § 4.33(3) within twenty (20) days of the date of this order;

(3) Plaintiff and Defendant shall submit a confidentiality order to govern the OCC information until a decision is rendered by the OCC through the administrative procedure; and

(4) Plaintiff and Defendant may resubmit arguments regarding discoverability of the OCC material on proper motion sixty-one (61) days after Plaintiff's request to the OCC.




**Cheryl BISCHOFF, Vicky Stites, Seth Spangle, Plaintiffs,**

**v.**

**State of FLORIDA, Robert Butterworth, in his official capacity as Attorney General of the State of Florida, Sheriff Charles C. Aycock, in his Official Capacity, Defendants.**

No. 6:98CV583–ORL–28JGG.

United States District Court, M.D. Florida. Orlando Division.

Jan. 3, 2003.

Protesters, who were threatened with arrest for engaging in a demonstration against company's support of homosexuality, brought action challenging constitutionality of Florida statutes prohibiting obstruction of public streets, highways, and roads and prohibiting the throwing advertising materials in motor vehicles. After remand, 222 F.3d 874, the District Court, Antoon, II, J., adopted the report and recommendation of United States Magistrate Judge Glazebrook, holding that: (1) protesters had standing to contest the constitutionality of Florida statutes, and (2) challenged statutes were facially invalid under First Amendment.

Judgment for plaintiffs.

**1. Constitutional Law ⟹42.1(3)**

Although they were not arrested during demonstration, protesters, who were threatened with arrest for engaging in a demonstration against company's support of homosexuality and who refrained from exercising their First Amendment rights in order to avoid arrest, had standing to contest the constitutionality of Florida statutes prohibiting obstruction of public streets, highways, and roads and prohibiting the throwing advertising materials in motor vehicles. West's F.S.A. §§ 316.2045, 316.2055.

**2. Federal Courts ⟹950**

Law of the case doctrine stands for the proposition that an appellate decision on an issue must be followed in all subsequent trial court proceedings unless the presentation of new evidence or an intervening change in the controlling law dictates a different result, or the appellate decision is clearly erroneous and, if implemented, would work a manifest injustice.

**3. Federal Courts ⟹950**

Law of the case doctrine is primarily concerned with the duty of lower courts to

IN THE CIRCUIT COURT IN AND FOR SANTA ROSA COUNTY, FLORIDA
CIVIL DIVISION

FIRST NATIONAL BANK OF FLORIDA
f/k/a First National Bank of Santa Rosa

Plaintiff,

CASE NO.: 96-1790-CA-01-CON
Division: C

v.

CHARLES C. AUSTIN, and
BEVERLY G. AUSTIN,
husband and wife,

Defendants.

Jun 20 2 47 PM '97
SANTA ROSA COUNTY CLERK'S OFFICE

Jun 20 2 48 PM '97
SANTA ROSA COUNTY CLERK'S OFFICE

## ORDER GRANTING STAY

THIS CAUSE having come before the Court on *Plaintiff's Motion for Reconsideration and Motion to Stay Court's Ruling Directing Plaintiff To Produce OCC Reports* filed by Plaintiff, First National Bank of Florida, f/k/a First National Bank of Santa Rosa, (the "Bank"), and the Court having reviewed the *Motion*, and the Court having found that the Austins have not complied with the rules and procedures set forth by federal law dealing with the disclosure of non-public OCC information, and the Court being otherwise fully advised in the premises,

IT IS CONSIDERED, ORDERED AND ADJUDGED as follows:

1. The Bank's *Motion for Reconsideration* is taken under advisement;

2. This Court's oral ruling of June 13, 1997 directing the Bank to produce OCC reports from 1989 until the present for an *in camera* inspection on Friday, June 20, 1997 is stayed until further order from this Court; and

AUG-01-2003 13:54 P.10

Case No. 97-1790-CA-01-CON
Order Granting Reconsideration and Stay
Page 2

3. The Austins are directed to comply with the rules and procedures set forth by federal law concerning the disclosure by the OCC of non-public OCC information.

DONE AND ORDERED in Chambers, at Milton, Santa Rosa County, Florida, this 19th day of June, 1997.

TERRY D. TERRELL
CIRCUIT COURT JUDGE

Conformed Copies to:

William E. Bond, Jr., Esq.
James L. Chase, Esq.

2

IN THE CIRCUIT COURT, FOURTH JUDICIAL CIRCUIT, IN AND FOR CLAY COUNTY, FLORIDA

JENNAFER LONG, on behalf of herself and others similarly situated,

Plaintiff,

vs.

CASE NO. 2000-837-CA
DIVISION: A

ACE CASH EXPRESS, INC., d/b/a ADVANCE CASH EXPRESS, and GOLETA NATIONAL BANK,

Defendants.

---

**ORDER DENYING PLAINTIFF'S SECOND MOTION TO COMPEL (GOLETA)**

THIS MATTER came before the Court upon the motion of Plaintiff Jennafer Long for an order compelling Goleta National Bank ("Goleta") to produce certain reports and documents made or submitted by Goleta to the Office of the Comptroller of the Currency ("OCC"). The Court, being fully advised in the premises, including the July 24, 2002, letter from the OCC to Goleta's counsel herein, it is

**ORDERED:**

1. Plaintiff's Second Motion to Compel Goleta is Denied.

2. The denial is without prejudice to the Plaintiff to pursue the request either through the Office of the Comptroller of the Currency or the federal courts.

**DONE AND ORDERED** in Chambers at Green Cove Springs, Clay County, Florida, this 27 day of August, 2002.

CIRCUIT COURT JUDGE



**U.S. Department of Justice**

*United States Attorney*
*Southern District of West Virginia*

*United States Courthouse*
*300 Virginia Street, East, Room 4000*
*Charleston, WV 25301*
*FAX: (304) 347-5443*

*Mailing Address*
*Post Office Box 1713*
*Charleston, WV 25326*
*(304) 345-2200*
*1-800-659-8726*

**BY HAND DELIVERY**
August 4, 2003

Honorable Jennifer Bailey Walker
Circuit Court of Kanawha County, West Virginia
111 Court Street, Judicial Annex
Charleston, WV 25301

Re: Tallman v. City National Bank of West Virginia
Civil Action No. 01-C-4090

Dear Judge Walker:

Please find enclosed a copy of Boron Oil Co. v. Downie, 873 F.2d 67 (4th Cir. 1989), to which I referred to in my oral argument to the court. In Boron Oil the Fourth Circuit held that federal supremacy prevented a state court from overriding the EPA's Touhy[1] regulations. Also enclosed is a copy of a July 21, 2003, Order entered in Bank of Guam v. Director of Dept. of Revenue and Taxation, Civil Action No. 6:03-0068 (U.S.D.C. S.D. W.Va. 2003), which affirmed the applicability of Touhy regulations in federal court cases which the United States is not a party. The Fourth Circuit precedent on the applicability of Touhy regulations to the nonparty government differs from the Sixth and Ninth Circuit cases cited by plaintiff.

In the Bank of Guam case, the Magistrate Judge ruled that the Bank of Guam must comply with the applicable Touhy regulations in seeking documents from the Bureau of Public Debt, a federal agency that was not a party to the litigation. After complying with the Touhy regulations the court held that the Bureau of Public Debt's decision was reviewable under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702-8301. Comsat Corp. v. National Science Foundation, 190 F.3d 269, 271, 274 (4th Cir. 1999)("when the government is not a party, the APA provides the sole avenue for review of an agency's refusal to permit its employees to comply with subpoenas"). These same principles are applicable to the plaintiff's request for Office of the Comptroller of the Currency ("OCC") documents in City National's possession. The OCC Touhy regulations make those documents the OCC's property. 12 C.F.R. § 4.32(b)(2). Accordingly, plaintiff's compliance with the OCC Touhy regulations is required to obtain or use the requested documents.

[1] United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951).

GOVERNMENT
EXHIBIT
3

The court also inquired about the turn around time once a Touhy request has been made. Under the OCC regulations a response is due within 60 days. However, I am sure there are extenuating circumstances that could require this time frame to be extended.

Thank you for your consideration of these matters and if you have any questions or need additional briefing, please feel free to contact me.

Sincerely yours,

KASEY WARNER
United States Attorney

By:

STEPHEN M. HORN
Assistant United States Attorney

SMH/cgb

Enclosure

cc: Martin R. Smith, Jr., Esq. (w/encl.)
Guy R. Bucci, Esq. (w/encl.)
Timothy C. Bailey, Esq. (w/encl.)
Carl S. Kravitz, Esq. (w/encl.)
Ancil Ramey, Esq. (w/encl.)
John Polak, Esq. (w/encl.)

y federal action.
1194, 91st Cong.,
) U.S.Code Cong.
. Once the fed-
ever, the FRSA
egulation of that
ional Ass'n of
nm'rs v. Cole-
Cir.1976) (§ 434
intent" in those
government has
ntext, Congress
d "whistleblow-
S.C. § 441. Ap-
efore does not
ry exception to

: wrongful dis-
by the second
SA preemption
ncurrent power
under certain
ualify for this
must be neces-
an "essentially
: be incompati-
ure; and must
ate commerce.
also H.R.Rep.
Sess., reprint-
: Admin.News
nded to allow
uations which
ional uniform-
discharge ac-
to remedy an
ard, is incom-
nedial scheme
es the federal
ided in § 441.
ion to FRSA
t apply. See

ot the common
. Clearly, the
"to alter exist-
the prohibition
orm." Id. See
n. 5. Section
al election of

VI.

We hold that the "whistleblower" provision of the Federal Railroad Safety Act provides appellant a federal remedy for his employer's alleged retaliatory acts. Section 441 preempts his Maryland cause of action for wrongful discharge, *see* 45 U.S.C. § 434, and this action was therefore properly removed to federal court. Appellant's claim is dismissed without prejudice for failure to pursue his federal administrative remedies. The judgment of the district court is hereby

AFFIRMED.

BORON OIL COMPANY; Vito Cutrone, Sr.; Fonda Cutrone; Sharon Lewis, Plaintiffs-Appellees,

v.

Jack L. DOWNIE, in his official capacity as an employee of the United States Environmental Protection Agency, Defendant-Appellant.

No. 88-3938.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 11, 1989.

Decided April 24, 1989.

After state court denied Environmental Protection agency's motion to quash two trial subpoenas and directed agency employee to testify in action to which Agency was not party, Agency removed subpoena proceedings to federal court. The United States District Court, Northern District of West Virginia, William M. Kidd, J., ordered employee to give testimony in state court. Agency appealed. The Court of Appeals, Chapman, Circuit Judge, held that district court lacked jurisdiction to compel employee to testify in state court action.

Reversed.

1. States ⇐18.93

Witnesses ⇐5

District court lacked jurisdiction to compel Environmental Protection Agency employee to appear and testify in state court action to which government was not a party after employee had been instructed by agency superiors, pursuant to valid agency regulations not to testify; to compel employee to testify contrary to agency's duly enacted regulations would have thwarted purpose and intended effect of federal regulations in violation of supremacy clause. 5 U.S.C.A. §§ 301, 702; U.S.C.A. Const. Art. 6, cl. 2.

2. Removal of Cases ⇐10

Jurisdiction of federal district court upon removal is essentially derivative of that of state court, and federal court acquires none upon removal. 28 U.S.C.A. § 1442.

3. United States ⇐125(24)

Even though government is not party to underlying action, nature of subpoena proceeding against federal employee to compel employee to testify about information obtained in official capacity is inherently that of action against United States and therefore proceeding falls within protection of sovereign immunity, because such proceeding interferes with public administration and compels federal agency to act in manner different from that in which agency would ordinarily choose to exercise its public function.

---

Martin William Matzen (Roger J. Marzulla, Asst. Atty. Gen., Anne S. Almy, Washington, D.C., Daniel S. Goodman, U.S. Dept. of Justice, Land & Natural Resources Div., William A. Kolibash, U.S. Atty., Wheeling, W.Va., Donnell Nantkes, Office of Gen. Counsel, Philip Yeany, Asst. Regional Counsel, U.S.E.P.A., on brief) for defendant-appellant.

Case 2:03-cv-02237 Document 1 Filed 10/08/03 Page 20 of 84 PageID #: 20

James F. Companion (Yolanda G. Lambert, Schrader, Stamp, Byrd, Byrum & Companion, Wheeling, W.Va., W. Dean De La Mater, De La Mater, Hagg & Bohach, Weirton, W.Va., on brief), for plaintiffs-appellees.

Before SPROUSE and CHAPMAN, Circuit Judges, and MOTZ, United States District Judge for the District of Maryland, sitting by designation.

CHAPMAN, Circuit Judge:

In the matter before the Court, the plaintiffs seek to compel an employee of the Environmental Protection Agency ("EPA"), Jack L. Downie ("Downie"), to testify in a state court civil action, contrary to specific instructions of his agency superiors, concerning information acquired during the course of his official duties. We hold that the state court, and the federal district court on removal, lacked jurisdiction to compel the defendant to appear and testify in a state court action to which the government is not a party. Thus, we reverse the order of the district court.

I.

The present dispute arose when, on August 17, 1987, and August 21, 1987, Downie was served with trial subpoenas to testify in a tort action pending in the Circuit Court of Brooke County, West Virginia. *Vito Cutrone, Sr., et al. v. Boron Oil Company,* Civil Action No. 83-C-149-Br. Downie was subpoenaed by both parties to testify about his investigation, as an EPA On-Scene Coordinator, of an alleged gasoline leak at a Boron Oil Company service station.

Although Downie initially consented to provide trial testimony subject to approval by his superiors and the EPA had cooperated in similar proceedings prior to this incident, one day before Downie's scheduled trial appearance in state court the Acting Regional Counsel for EPA Region 3 concluded that Downie's testimony "would not clearly be in the interest of the EPA." The EPA issued a written determination that Downie not be permitted to testify.

The Circuit Court of Brooke County denied EPA's motion to quash the two trial subpoenaes and directed Downie to testify. The EPA promptly removed the subpoena proceedings (but not the underlying civil action) to the United States District Court for the Northern District of West Virginia pursuant to 28 U.S.C. § 1442(a). The district court held a hearing to ascertain the nature of Downie's employment, his involvement in the underlying tort action, and the extent to which his appearance as a witness would interfere with his official duties.

The district court held that removal was proper, pursuant to *North Carolina v. Carr,* 386 F.2d 129 (4th Cir.1967), and that its jurisdiction on removal included authority to review the EPA's decision to prohibit Downie from testifying. The district court made factual findings that none of the information sought from Downie is alleged to be privileged, that Downie's testimony is essential to the fair administration of justice in the civil action, that Downie is the most knowledgeable person available to give an unbiased, impartial account of the events giving rise to the tort action, and that the interference and inconvenience to Downie and the EPA resulting from his giving testimony would be minimal at best. The court also noted that prior to the present action it had been the EPA's policy to cooperate fully with private citizens regarding matters of this nature, that Downie had voluntarily consented to provide trial testimony subject only to approval by his superior, that there were no written reports prepared in connection with Downie's investigation of the alleged gas leak, and that the cost and expenses to Downie and the EPA resulting from Downie's trial testimony would be borne by the parties seeking his testimony.

In reaching its conclusion, the district court looked to the following "housekeeping" statute which provides the Congressional mandate to be followed by all departments seeking to invoke and apply regulations promulgated thereunder:

> The head of an Executive department or military department may prescribe

regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

5 U.S.C. § 301.

The EPA relied upon EPA Regulations promulgated at 40 C.F.R. § 2.401(c), Subpart C (1986), in denying Downie permission to testify. The regulations instruct:

> The purpose of this subpart is to ensure that employees' official time is used only for official purposes, to maintain the impartiality of EPA among private litigants, to ensure that public funds are not used for private purposes and to establish procedures for approving testimony or production of documents when clearly in the interests of EPA.

"[A]lthough § 301 does permit centralization of responsibility in a department head to claim a privilege," the district court concluded, "it clearly does not confer a privilege to withhold information from the public."

The district court similarly rejected the defense of sovereign immunity, holding that neither the United States nor the EPA were named parties, thus, "there is no relief sought or sued against the sovereign in this case."

The district court ordered Downie to give testimony in the state court and required that the timing of his appearance make accommodation for his work schedule and that the appellees, the private litigants in the underlying civil action, bear the cost of his appearance.

## II.

The EPA seeks to quash the subpoenaes on the ground that it is not subject to a subpoena issued by a state or local court, with respect to actions to which it is not a party, in the absence of a waiver of sovereign immunity. The EPA also argues that the subpoenaes must be quashed because they do not comply with the internal EPA regulations concerning state court subpoenaes, authorized by 5 U.S.C. § 301 and codified at 40 C.F.R. § 2.401(c).

### A.

[1] It is well established that an action seeking specific relief against a federal official, acting within the scope of his delegated authority, is an action against the United States, subject to governmental privilege of immunity. *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 688, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628 (1949); 3A Moore's Federal Practice ¶ 19.15. Downie's refusal to testify was at the behest of his EPA superior, the Acting Regional Counsel for Region 3. The EPA decision was made pursuant to regulations set forth at 40 C.F.R. § 2.401. These regulations provide, *inter alia*, that an employee of the EPA may testify in response to a subpoena only to the extent expressly authorized by the agency.

The Supreme Court has specifically recognized the authority of agency heads to restrict testimony of their subordinates by this type of regulation. *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951). In *Touhy*, the Supreme Court ruled that a subordinate official of the Justice Department could not be held in contempt for refusing, in a habeas corpus proceeding by a state prisoner, to obey a subpoena *duces tecum* when his compliance had been prohibited by an order of a superior department official acting pursuant to valid federal regulations governing the release of official documents. As in the case *sub judice*, the government was not a party to the underlying action. The regulations in *Touhy* were promulgated under the statutory predecessor of the current "housekeeping" statute, 5 U.S.C. § 301.

*Touhy* is part of an unbroken line of authority which directly supports Downie's contention that a federal employee may not be compelled to obey a subpoena contrary to his federal employer's instructions under valid agency regulations. The district court clearly departed from this line of

cases. In *Swett v. Schenk*, 792 F.2d 1447, 1451-52 (9th Cir.1986), the court affirmed the trial court's dismissal of a state court's contempt proceeding against a National Transportation Safety Board's investigator who had, pursuant to valid NTSB regulations, submitted to deposition but declined to testify about other matters. The government, as in the case at bar, was not a party to the underlying action, and the litigant sought the investigator's testimony for his expert knowledge rather than for a recitation of agency records. *See also Reynolds Metals Co. v. Crowther*, 572 F.Supp. 288, 290-91 (D.Mass.1982) (federal district court dismissed contempt proceeding which would have compelled OSHA investigators to testify in private civil action in state court contrary to agency's instructions under valid agency regulations); *Smith v. C. R. C. Builders Co., Inc.*, 626 F.Supp. 12, 14 (D.Colo.1983) (in a case removed to the federal court to hear contempt proceedings, the district court held that an OSHA official could not be compelled to disobey a direct order from an agency superior not to disclose certain information in a state wrongful death action, nor be punished for his adherence to the mandate of valid department regulations).

The policy behind such prohibitions on the testimony of agency employees is to conserve governmental resources where the United States is not a party to a suit, and to minimize governmental involvement in controversial matters unrelated to official business. *Reynolds Metals*, 572 F.Supp. at 290. Because of the nature of the duties it exercises and programs it administers, the EPA is particularly vulnerable to the demands of private parties seeking information acquired as a result of official investigations concerning incidents such as that in the case *sub judice*. If EPA On-Scene Coordinators were routinely permitted or compelled to testify in private civil actions, significant loss of manpower hours would predictably result and agency employees would be drawn from other important agency assignments.

B.

The district court exceeded its jurisdiction upon removal, which it derived solely from that of the state court, in compelling Downie to testify contrary to the direction of the EPA. The doctrine of sovereign immunity precludes the state court—and the federal court which gained limited jurisdiction upon removal—from exercising jurisdiction to compel Downie to testify contrary to EPA instructions, and also denies it the authority to review and set aside the EPA's decision and the federal regulations under which it is made. Significantly, the court in *Swett v. Schenk*, *supra*, noted that "the *Touhy* doctrine is jurisdictional" and the state court lacked jurisdiction to compel the investigators to testify, and the federal court itself similarly lacked such power since it "acquired no jurisdiction on removal." *Swett*, 792 F.2d at 1451-52.

[2] The jurisdiction of a federal district court upon removal, pursuant to 28 U.S.C. § 1442, is essentially derivative of that of the state court, and the federal court acquires none upon removal. *Arizona v. Manypenny*, 451 U.S. 232, 242 n. 17, 101 S.Ct. 1657, 1665 n. 17, 68 L.Ed.2d 58 (1981). The Supreme Court has instructed that "jurisdiction of the federal court on removal is, in a limited sense, a derivative jurisdiction. Where the state court lacks jurisdiction of the subject matter or of the parties, the federal court acquires none, although in a like suit originally brought in a federal court it would have had jurisdiction." *Minnesota v. United States*, 305 U.S. 382, 389, 59 S.Ct. 292, 295, 83 L.Ed. 235 (1939).

The EPA has not waived its immunity, thus the state court (and the federal court on removal) lacks jurisdiction to proceed against a federal employee acting pursuant to agency direction. The district court found that the doctrine of sovereign immunity was inapplicable because the government was not a party to the underlying action and the subpoenas were directed to Downie personally and not in his capacity as a federal employee of the EPA.

[3] Even though the government is not a party to the underlying action, the nature of the subpoena proceeding against a federal employee to compel him to testify

ırt, in compelling
r to the direction
ne of sovereign
state court—and
ined limited jur-
from exercising
wnie to testify
ns, and also de-
ew and set aside
federal regula-
. Significantly,
k, supra, noted
jurisdictional"
jurisdiction to
testify, and the
ly lacked such
jurisdiction on
at 1451–52.

federal district
nt to 28 U.S.C.
tive of that of
leral court ac-
Arizona v. Ma-
1. 17, 101 S.Ct.
58 (1981). The
ed that "juris-
on removal is,
ve jurisdiction.
jurisdiction of
e parties, the
although in a
in a federal
jurisdiction."
305 U.S. 382,
d. 235 (1939).

its immunity,
federal court
n to proceed
ting pursuant
listrict court
ereign immu-
the govern-
s underlying
e directed to
his capacity
EPA.

nment is not
1, the nature
gainst a fed-
n to testify

about information obtained in his official capacity is inherently that of an action against the United States because such a proceeding "interfere[s] with the public administration" and compels the federal agency to act in a manner different from that in which the agency would ordinarily choose to exercise its public function. *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). The subpoena proceedings fall within the protection of sovereign immunity even though they are technically against the federal employee and not against the sovereign. We have previously instructed that suits against federal employees may be barred by the doctrine of sovereign immunity where the effect of the suit falls upon the government:

> It is not necessary that the United States be denominated as a party. An action against a federal agency or official will be treated as an action against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or compel it to act."

*Portsmouth Redevelopment & Housing Authority v. Pierce*, 706 F.2d 471, 473 (4th Cir.1983), quoting *Dugan v. Rank*, 372 U.S. at 620, 83 S.Ct. at 1006. Clearly, Downie's appearance at the state court proceeding is sought because of the knowledge he acquired in the course of his official duties.

The doctrine of sovereign immunity has been applied in federal courts in situations analogous to the case at bar. *See, e.g., Environmental Enterprises, Inc. v. EPA*, 664 F.Supp. 585, 586 (D.D.C.1987) ("As to sovereign immunity, there is obvious merit to the argument that federal officers should not be subpoenaed to testify in state courts proceedings of which they are not parties without their approval." Thus, where EPA had not waived sovereign immunity, subpoena to testify in state civil action was quashed.); *Reynolds Metals Co. v. Crowther*, 572 F.Supp. 288, 290–91 (D.Mass.1982) (federal official's refusal to testify in response to state court subpoena protected by privilege of sovereign immunity); *United States v. McLeod*, 385 F.2d 734, 752 (5th Cir.1967) (federal officers could not be subpoenaed to testify before a state grand jury).

The principle of federal supremacy reinforces the protection of sovereign immunity in the case at bar. The assertion of state court authority to override the EPA's *Touhy* regulations clearly violates the Constitution's Supremacy Clause. First, Congress has expressly limited Administrative Procedure Act review to the federal courts, and a state court's assertion of the power of judicial review over federal agencies directly contravenes 5 U.S.C. § 702. Second, properly promulgated agency regulations implementing federal statutes have the force and effect of federal law which state courts are bound to follow. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 295–96, 99 S.Ct. 1705, 1714–15, 60 L.Ed.2d 208 (1979). The action of a state court to compel an official of a federal agency to testify contrary to the agency's duly enacted regulations clearly thwarts the purpose and intended effect of the federal regulations. Such action plainly violates both the spirit and the letter of the Supremacy Clause.

This Court is aware that the facts of this case suggest that the EPA could, as the district court ordered, comply with the state court processes without undermining the immediate purposes for the EPA regulations. The district court suggests that this leads irresistibly to the conclusion that the EPA's action was "arbitrary and capricious and unreasonable." This contention ignores, however, the important fact that the EPA was acting pursuant to duly promulgated regulations and the concerns which motivated the agency may have extended beyond the burdens represented by Downie giving testimony in this particular case. The agency has a valid and compelling interest in keeping its On–Scene Coordinators, as a class, free to conduct their official business without the distractions of testifying in private civil actions in which the government has no genuine interest. Indeed, it is plausible that Downie has not been burdened in the past by requests to testify in private state court actions be-

cause the EPA has successfully and steadfastly resisted previous attempts to compel its employees to testify. The current explosion in environmental litigation must surely give warning to the EPA that a strict adherence to its internal regulations is essential if it is to be successful in preventing its expert employees from being targeted as potential witnesses in private actions.

For the foregoing reasons, the order of the district court is

REVERSED.

MARION SQUARE CORPORATION, a West Virginia corporation; Marion Associates Limited Partnership, a West Virginia limited partnership, Plaintiffs-Appellants,

v.

The KROGER CO., an Ohio corporation, Defendant-Appellee.

No. 88-3835.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1988.

Decided April 24, 1989.

Lessor of grocery store brought action after lessee informed it that it did not wish to cancel lease pursuant to parties' earlier agreement. The United States District Court for the Southern District of West Virginia, Elizabeth V. Hallanan, J., declined to enforce cancellation agreement on statute of frauds grounds. Lessor appealed. The Court of Appeals held that: (1) letters documenting parties' agreement satisfied statute of frauds as to effective date and quantity of equipment that was to be sold as condition of agreement, and (2) after lessor actually committed itself to lease store and sell existing equipment to third party, lessee could not argue that its regional real estate manager had in fact lacked authority to negotiate agreement.

Reversed and remanded.

1. Frauds, Statute of ⚷113(3)

Under West Virginia law, fact that letters lessee sent to lessor documenting oral agreement to cancel long-term lease did not refer to specific effective date of agreement did not render agreement unenforceable inasmuch as lessee had made it clear that it wished to have lease cancelled as soon as possible, dependent only upon lessor finding replacement lessee.

2. Frauds, Statute of ⚷113(3)

Description of "existing equipment" to be sold by lessee to lessor as part of agreement to cancel long-term lease of store was certain enough to satisfy West Virginia statute of frauds; there was no indication that either party thought that any other equipment than that to be seen upon inspection of store facility was to be sold.

3. Corporations ⚷425(4)

After store lessor agreed to cancel long-term lease and actually committed itself to lease store and sell existing equipment to third party, lessee could not claim that cancellation agreement negotiated by its regional real estate manager had not been approved by lessee's principal executives and that manager had in fact lacked authority to enter into agreement; manager supplied lease cancellation forms that were incomplete only because final details remained to be agreed upon, and manager spoke with every appearance of authority.

---

Kevin B. Burgess (Hamilton, Mooney, Burgess, Young & Tissue, Oakhill, W. Va., on brief), for plaintiffs-appellants.

Mark A. Swartz (Kevin A. Nelson, Love, Wise & Woodroe, Charleston, W. Va., on brief), for defendant-appellee.

Before ERVIN, Chief Judge, WINTER, Circuit Judge, and HAYNSWORTH, Senior Circuit Judge.

ENTERED
JUL 2 1 2003
SAMUEL L. KAY, CLERK
U. S. District & Bankruptcy Courts
Southern District of West Virginia

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

PARKERSBURG

BANK OF GUAM,

Petitioner,

v.

CIVIL ACTION NO. 6:03-0068
(Civil Action No. 01-00016
in United States District
Court, Territory of Guam)

DIRECTOR OF DEPARTMENT OF
REVENUE AND TAXATION,

Respondent.

BUREAU OF PUBLIC DEBT,

Recipient of Subpoena.

MEMORANDUM ORDER

Pending before the court are the following motions relating to records previously produced by the Bureau of Public Debt ("BPD") to the Bank of Guam ("the Bank") pursuant to a Freedom of Information Act ("FOIA") request, and subsequently requested again pursuant to a Rule 45 subpoena *duces tecum*:

1. Petitioner's Motion to Compel (docket sheet document # 4), which was filed on May 5, 2003, and is supported by a Memorandum (# 5), and the Declaration and Supplemental Declaration of Jerome Sapiro, Jr., with exhibits (## 6-8). BPD responded in opposition (# 19), and the Bank filed its Reply (# 25).

2. BPD's Motion to Quash Subpoena Duces Tecum (# 18), which

was filed on May 19, 2003, and is supported by a Memorandum (# 19), and a Declaration of Jennifer Chamberlin (# 23). The Bank responded in opposition (# 30) with a memorandum and a Declaration of Jerome Sapiro, Jr. (# 32). BPD filed a Reply (# 40).

3. BPD's Motion to Seal Documents Containing Confidential Return Information and Memorandum (# 20), and

4. BPD's Motion for Return of Documents Containing Confidential Return Information and Memorandum (# 21), both of which were filed on May 19, 2003. The Bank responded in opposition to both motions with a memorandum (# 31), and BPD submitted a Reply (# 41).

5. BPD's Motion for Leave to File Surreply (# 37) with Surreply provided (# 38), filed on June 18, 2003. The Bank opposes the Motion (# 44), and BPD filed a Reply (# 46).

The Director of the Department of Revenue and Taxation of the Territory of Guam has not entered an appearance in this action, although counsel for Respondent has been served with some of the documents listed above.

On July 15, 2003, the court conducted a hearing on the Motions, at which William D. Wilmoth and Jerome Sapiro, Jr. appeared for the Bank, and Assistant U.S. Attorney Sandra Henson Kinney and Paul G. Wolfteich, Senior Counsel of BPD, appeared for BPD.

**Pertinent Facts**

The Bank and the Director of the Department of Revenue and Taxation are engaged in litigation in the United States District Court in Guam concerning the ability of Guam to tax interest paid to the Bank on U.S. government obligations (No. 01-00016). On August 22, 2003, the Bank submitted an FOIA request to BPD and received approximately 190 documents comprising about 700 pages.

The Bank wants to use the BPD documents in its litigation and needs to authenticate them. In an attempt to do so, on February 21, 2003, the Bank issued a subpoena *duces tecum* to the Custodian of Records, Bureau of Public Debt, commanding that the documents be produced on March 17, 2003, at an address in Parkersburg, West Virginia. (# 6, Ex. 8.) The subpoena was worded nearly identically to the FOIA request. The subpoena did not include any notice that testimony would be taken. The subpoena was served on February 24, 2003. (# 6, Ex. 9.) BPD took no action in response to service of the subpoena pursuant to Rule 45, *Fed. R. Civ. P.*

On March 17, 2003, BPD produced 198 pages of documents to attorney Jerome Sapiro, Jr.'s office in response to the subpoena. (# 6, at 4.) The cover letter accompanying the documents, dated March 12, 2003 (# 6, Ex. 12), was signed by Chief Counsel for BPD, Brian Ferrell. It explained that, when BPD responded to the FOIA request, it inadvertently produced (a) IRS documents, (b) BPD documents subject to an FOIA exemption, (c) attorney work product

documents, (d) interagency or intra-agency documents, and/or (e) pre-decisional documents. The cover letter also asserted that BPD had not waived its FOIA b(5) exemption, despite its production of documents. A so-called "privilege log" accompanied the documents. The cover letter does not contain a specific objection to the subpoena.

A second letter from BPD was dated April 8, 2003, and was signed by Paul G. Wolfteich, Senior Counsel of BPD. (# 6, Ex. 95.) It was written and sent after a telephone conversation between Messrs. Wolfteich and Sapiro, during which Mr. Sapiro apparently requested testimonial authentication of the documents received via FOIA. The letter from Mr. Wolfteich invoked the so-called "housekeeping" or *Touhy*[1] regulations, 31 C.F.R. Part 1, and stated:

> The regulations set forth a procedure that you must follow and the showing that you must make in order to obtain this approval [for production of documents or for testimony]. You have not followed this procedure or made the required showing. Therefore, we respectfully object to your subpoena for documents, your demand for a detailed privilege log, and your request for testimony. As was evident from our initial response to your subpoena, we also object to the subpoena because it seeks privileged and confidential documents protected from disclosure under Rule 26 of the Federal Rules of Civil Procedure.
>
> I understand that you have already obtained a number of the documents requested in your subpoena through a FOIA request. We have notified you that many of these documents were subject to a FOIA exemption and were inadvertently produced. We respectfully request their immediate return.

---

1 *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

Id. Subsequent telephone conversations between Messrs. Sapiro and Wolfteich failed to achieve agreement on the documents. (# 6, at 49.)

After appropriate but unsuccessful efforts to meet and confer concerning BPD's response to the subpoena, the Bank filed the Motion to Compel (# 4). BPD then filed its various motions.

**1. Motion to Compel and 2. Motion to Quash**

The BPD is not a party to the litigation between the Bank and the Guam taxing authority. The Fourth Circuit has held that "when the government is not a party to the underlying action, an agency's refusal to comply with a subpoena must be reviewed under the standards established for final agency actions by the Administrative Procedure Act ('APA'), 5 U.S.C. §§ 702-8301." Comsat Corp. v. National Science Foundation, 190 F.3d 269, 271 (4th Cir. 1999).

> The APA waives the government's sovereign immunity from suit and permits federal court review of final agency actions, when the relief sought is other than money damages and the plaintiff has stated a claim "that an agency or an officer or employee thereof acted or failed to act in an official capacity . . . ." 5 U.S.C. A. § 702. As the Supreme Court has instructed, an agency action may be considered "final" only when the action signals the consummation of an agency's decisionmaking process *and* gives rise to legal rights or consequences. *See Bennett v. Spear*, 520 U.S. 154, 177-78, 117 S. Ct. 1154, 137 L. Ed.2d 281 (1997). A reviewing court may set aside a final agency action when the action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 5 U.S.C. § 706.

190 F.3d at 274.

The Bank contends that Comsat does not control this action and cites various reasons, all of which the court finds to be unpersuasive. The Bank suggests that BPD's sovereign immunity has been waived by Congress' action in designating the United States District Court in Guam as the court with jurisdiction to resolve disputes arising under the Guam Territorial income tax. (# 25, at 4-6.) There is no indication that the BPD has waived sovereign immunity with respect to the subpoena *duces tecum* except as set forth in the APA. The Bank also asserts that the involvement of a "federal instrumentality" (the Guam Department of Revenue and Taxation) means that another federal agency (BPD), which is not a party, cannot claim sovereign immunity. (# 25, at 7-8.) There is no support for this proposition.

The court announced at the hearing that it intended to rely on Comsat, and the hearing proceeded on that basis. Accordingly, the court will review BPD's final agency action with respect to the Bank's request for documents and testimony pursuant to the APA and applicable *Touhy* regulations.

The parties do not dispute that the Bank did not comply with BPD's *Touhy* regulations when it issued the subpoena. Those regulations provide as follows:

> **§1.11 Testimony or the production of records in a court or other proceeding.**
>
> * * *
>
> (c) In court cases in which the United States or the

> Treasury Department is not a party, where the giving of testimony is desired, an affidavit by the litigant or the litigant's attorney, setting forth in the information with respect to which the testimony of such officer or employee is desired, must be submitted before permission to testify will be granted. Permission to testify will, in all cases, be limited to the information set forth in the affidavit or to such portions thereof as may be deemed proper.

31 C.F.R. § 1.11(c) (2002).[2]

BPD has deemed the Bank's Motion to Compel a *Touhy* request and promised to "render a decision regarding the documents sought through the subpoena . . .," which decision "will be a final agency decision subject to review in District Court under the standards of the APA, i.e., reversible only if the BPD action is arbitrary, capricious, an abuse of discretion or contrary to law." (# 18, at 7-8 n.4.)

The court learned at the hearing that BPD has rendered its final agency decision, by letter dated July 10, 2003, signed by Brian Ferrell, Chief Counsel of BPD. BPD agreed at the hearing to litigate, in this action, whether its final agency decision was arbitrary, capricious, or an abuse of discretion, rather than insisting upon the Bank's filing of a separate action pursuant to the APA. Accordingly, the procedural posture of this case has changed.

Based on the Bank's initial failure to comply with 31 C.F.R.

---

[2] The regulations were amended and published in the Federal Register on March 17, 2003, 68 Fed. Reg. 12,584; presumably the amended version will apply to this case.

§ 1.11, and BPD's right to assert sovereign immunity with respect to a Rule 45 subpoena *duces tecum*, it is appropriate, at this stage of the proceedings, to deny the Bank's Motion to Compel without prejudice.  Inasmuch as it is not necessary to proceed further on the Motion to Compel, the court will deny BPD's Motion for Leave to File Surreply.  Moreover, BPD's Motion to Quash is now moot.

The Bank and BPD agreed, at the hearing, to take various actions designed to narrow the issues as much as possible.  The Bank will seek stipulations and/or admissions from Respondent as to the authenticity of documents produced by BPD to the Bank pursuant to the FOIA request.  BPD will re-certify the documents previously produced to the Bank in response to the subpoena *duces tecum* in such form and with such language and seal as may be appropriate so that they may be offered into evidence.  If there are additional documents previously produced as to which BPD does not assert a *bona fide* reason for non-production, BPD will certify those documents (even if the certificate states only that they were found in BPD's files), so that the Bank can offer them into evidence. BPD will compile a new log setting forth the identity of each document as to which they claim a *bona fide* reason for non-production, and the reason and authority for the non-production.

If, after taking these steps, there remain disputes between the Bank and BPD requiring resolution, the Bank will file its motion and memorandum, with BPD filing its response, and the Bank

filing its reply on a schedule in conformity with the Local Rules. Service will be by email and mail.

**3. Motion to Seal**

BPD has moved to seal Exhibits 32, 33, 34, 35, 36, and 65 of documents ## 6 and 7, on the ground that they contain third party return information, as defined and addressed by 26 U.S.C. § 6103. These exhibits, which were produced by BPD to the Bank in response to the FOIA request (possibly in violation of 26 U.S.C. § 6103), concern litigation in the U.S. District Court for the Virgin Islands which was filed by taxpayers and which addressed issues concerning the taxation by territorial authorities of interest paid on U.S. government obligations.

During the hearing, the Bank and BPD stipulated and agreed to substitute those pages which name the Virgin Island taxpayers with pages with the taxpayers' names obliterated or otherwise redacted. The court concludes that substitution of the pages is a suitable and limited remedy to cure what may have been an improper disclosure of confidential return information, and that sealing the exhibits is not required.

In compliance with Nixon v. Warner Communications, Inc., 435 U.S. 589 (1978), and In re Knight Publishing Co., 743 F.2d 231 (4th Cir. 1984), the court finds that the Exhibits are not being used for an improper purpose, that their continued presence on the public record may enhance the public's understanding of the issues

in the underlying litigation, and that the public has already had access to the information contained in the records by virtue of the Virgin Island taxpayers having filed their own lawsuit, which contained the identifying and monetary information contained in the Exhibits. However, the names of the Virgin Island taxpayers are completely irrelevant to these factors, have no bearing on the underlying litigation, and constitute information which should be kept private.

**4. Motion for Return of Documents**

BPD has moved the court to enter an order requiring the Bank to return to BPD Exhibits 32, 33, 34, 35, 36, and 65, attached to documents ## 6 and 7. The basis for the motion is that the documents concern taxpayers who are unrelated to the Bank, and contain third-party return information which is confidential pursuant to 26 U.S.C. § 6103. (## 20, 21.) BPD asserts that Section 6103 creates a statutory privilege which affects litigants' ability to discover tax returns and return information through discovery. (# 20, at 2.) It argues that "Section 6103 places absolute limitations on tax information that parties can obtain in civil discovery," citing Olsen v. Egger, 594 F. Supp. 644 (S.D.N.Y. 1984). (Id., at 3.) BPD also cites Mallas v. United States, 993 F.2d 1111, 1120 (4th Cir. 1993), for the proposition that "[u]nless the disclosure is authorized by a specific statutory exception, section 6103(a) prohibits it." On that basis, BPD asked that the

Exhibits be both sealed and returned to BPD. (Id.)

The Bank has responded in opposition, asserting that "BPD points to no statutory or decisional basis for its contentions that it is entitled to return of documents it produced under FOIA . . . ." (# 31, at 1.) The Bank makes four arguments against returning the documents: BPD waived its objections; the documents are not confidential tax return information; BPD's claim that the documents are tax return information is a pretext to avoid BPD's waiver of work product and governmental deliberation privileges; and BPD is not entitled to return of the documents. (# 31, at ii.)

In its Reply, BPD contends that the Exhibits contain confidential return information pursuant to section 6103, that the confidentiality of the information cannot be waived by the government, and that the All Writs Act, 28 U.S.C. § 1651, empowers the court to order return of the documents. (# 41.)

At the hearing, counsel for the Bank argued that Kirshner v. Uniden Corp. of America, 842 F.2d 104 (9th Cir. 1988), headnotes 6 and 7, was pertinent authority. Counsel for BPD responded to this argument by letter dated July 21, 2003.

First it is necessary to describe the Exhibits at issue. They are as follows:

a. Ex. 32: A seventeen-page double-spaced draft of a letter (fax date 4/12/89) from the Office of Chief Counsel of the Internal Revenue Service to the Acting Assistant Attorney General of the Tax Division, U.S. Department of Justice, concerning a recommendation that the Tax Division file a motion to dismiss the Virgin

Island taxpayers' suit for failure to state a claim upon which relief can be granted;

b. Ex. 33: A seventeen-page double-spaced draft which is apparently the same draft letter as Ex. 32, although hand-written markings appear to be different;

c. Ex. 34: A two-page letter dated April 14, 1989, from the Office of Chief Counsel of the Internal Revenue Service to the Acting Assistant Attorney General of the Tax Division, U.S. Department of Justice, recommending the filing of a motion to dismiss the United States from the Virgin Islands taxpayers' suit for failure to state a claim upon which relief can be granted based on sovereign immunity. The letter indicates that the IRS is coordinating its position with Main Treasury and BPD (thus explaining the draft which is Ex. 32);

d. Ex. 35: A nine-page single-spaced draft, which is an edited version of Ex. 32, which supplements the letter which is Ex. 34;

e. Ex. 36: The ten-page single-spaced final version of the letter from the Office of Chief Counsel of the Internal Revenue Service to the Acting Assistant Attorney General of the Tax Division, U.S. Department of Justice, fax date 4/26/89, which supplements Ex. 34;

f. Ex. 65: The same document as Ex. 36, *albeit* with highlighting and at least one interlineation.

(## 6 and 7.)

**Applicability of 26 U.S.C. § 6103**

Each of the Exhibits described above includes the names of the Virgin Island taxpayers, the amount of tax alleged to be owed by them, and the amount of interest on U.S. Treasury bills received by the taxpayers in a given year.

> Section 6103 sets forth a "general rule" that [r]eturns and return information shall be confidential, and except as authorized by this title –
> (1) no officer or employee of the United

> States,
>
> * * *
>
> shall disclose any return or return information obtained by him in any manner in connection with his service as such as officer or an employee or otherwise or under the provisions of this section.

*Id.* § 6103(a). The same section defines "return information" as

> a taxpayer's identity, the nature, source, or amount of his income, . . . tax liability, . . . deficiencies, . . . or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax . . . .

*Id.* § 6103(b)(2)(A). It also defines a "disclosure" broadly, as "the making known to any person in any manner whatever a return or return information. *Id.* § 6103(b)(8).

Mallas, 993 F.2d at 1117-18.

If the parties are unable to settle their differences, the court anticipates that it will be asked to determine whether the Exhibits at issue fall within the definition of "return information" or some other ground which would justify BPD in not certifying that the documents are authentic or that they came from BPD's files. Accordingly, it would be inappropriate to make a ruling now. Whether or not the Exhibits should have been disclosed to the Bank, the question presented here is whether BPD has a remedy in the form of an order directing the Bank to return the six documents.

Statutory privilege

BPD argues that Congress created a statutory privilege when it enacted § 6103, and that section restricts discovery of return information. There is no dispute that § 6103 prevents disclosure by governmental employees of return information in the course of litigation, with few exceptions. There are reams of cases which hold that the government can withhold return information when the exceptions to the statute are not met. None of the cases cited by BPD addresses the question of whether documents must be returned to the government when they have been disclosed by mistake. Counsel for BPD conceded that they was unaware of any such case having been decided.

BPD asserts that the court should invoke its powers under the All Writs Act, 28 U.S.C. § 1651(a). The All Writs Act authorizes a federal court to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The Act empowers a federal court to "issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." Pennsylvania Bureau of Corr. v. United States Marshals Serv., 474 U.S. 34, 40 (1985) (internal quotations omitted). Relief under the All Writs Act is a drastic remedy and should be used only in extraordinary circumstances. See Kerr v. United States Dist.

Court, 426 U.S. 394 (1976); In re Beard, 811 F.2d 818, 826 (4th Cir. 1987).

The court finds that extraordinary circumstances are not presented here. There remains some question whether the Exhibits at issue are in fact "return information" protected by Section 6103. As an interim measure, the court has directed, and the Bank has agreed to undertake, intermediate measures to remove the Virgin Island taxpayers' names from documents disclosed in the underlying action. Further relief is not required at this time.

**Rulings**

It is hereby **ORDERED** as follows:

1. Bank of Guam's Motion to Compel (# 4) is denied without prejudice.

2. BPD's Motion to Quash (# 18) is denied as moot.

3. BPD's Motion for Leave to File Surreply (# 37) is denied as moot.

4. No later than **August 15, 2003**, the Bank will advise BPD and the Court of its success in obtaining stipulations and/or admissions from Respondent concerning the authenticity of BPD documents produced to the Bank pursuant to the FOIA request and the subpoena *duces tecum*.

5. No later than **August 15, 2003**, BPD will re-certify documents previously produced in response to the subpoena *duces tecum* and certify such other documents as to which it does not

claim a *bona fide* reason for non-production.

6. BPD's Motion to Seal (# 20) is denied, and the Bank's counsel is directed to substitute the pertinent pages as to all copies of the exhibits which the Bank has distributed, including the Clerk's Office of this Court, within six business days of entry of this Memorandum Order.

7. BPD's Motion for Return of Documents (# 21) is denied without prejudice.

8. The Bank's Request for Judicial Notice (# 27), which is not opposed by BPD, is granted.

The Clerk is requested to send a copy of this Order to counsel of record.

ENTER: July 21, 2003

Mary E. Stanley
Mary E. Stanley
United States Magistrate Judge

August 7, 2003

ATTORNEYS AT LA
Guy R. Bucci
Timothy C. Bailey*
L. Lee Javins
J. Kristofer Cormar
Carrie L. Webster
* ALSO ADMITTED IN KENTUCKY

**BY HAND DELIVERY**

Honorable Jennifer Bailey Walker
Circuit Court of Kanawha County
111 Court Street, Judicial Annex
Charleston, WV 25301

RE: Tallman v. City Holding Company, et al

Dear Judge Walker:

On August 6, 2003, we received a copy of a letter, dated August 4, 2003, written to you by Assistant U.S. Attorney Stephen M. Horn. In the letter, to which Mr. Horn attached an opinion of the United States Court of Appeals for the Fourth Circuit and a decision of a federal magistrate judge for the Southern District of West Virginia, he reprised his argument that, pursuant to the U.S. Supreme Court's opinion in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), this Court must reject the plaintiff's request for an order compelling defendant City National Bank to produce to the plaintiff certain materials related to examinations of the bank by the Office of the Comptroller of the Currency ("OCC"). Because *Touhy* and its progeny, including the two cases appended to Mr. Horn's letter, deal with subpoenas served upon agencies of the federal government, and not, as here, discovery requests made of a private party like defendant City National Bank, the *Touhy* doctrine is wholly inapposite.

In *Touhy*, a habeas corpus petitioner served a subpoena upon the Special Agent in Charge of the Chicago FBI office, who, in accordance with a validly issued rule of the Department of Justice, refused to produce the subpoenaed documents. 340 U.S. at 455. In *Boron Oil Co. v. Downie*, 873 F.2d 67, 71 (4th Cir. 1989), which Mr. Horn cited in both his oral argument to this Court on Monday and in his letter, the Fourth Circuit held that the doctrine of sovereign immunity precluded a state court from compelling an EPA employee to testify in state court, an action which the Fourth Circuit found was "inherently that of an action against the United States." The other case included with Mr. Horn's letter, *Bank of Guam v. Director of Dept. of Revenue and Taxation*, Civil Action No. 6:03-0068 (U.S.D.C. S.D. W.Va. 2003), involved a subpoena purporting to require the Bureau of Public Debt to produce documents.

GOVERNMENT EXHIBIT C

BUCCI BAILEY & JAVINS

In this case, in contrast, the plaintiff has served a document request for various materials on the defendant City National Bank. Because the bank is clearly not a federal agency, and the plaintiff's request does not compel the OCC or any other federal agency "to act in a manner different from that in which the agency would ordinarily choose to exercise its public function," *Boron Oil*, 873 F.2d, at 71, the plaintiff's request, and the motion for an Order to compel, do not implicate the doctrine of sovereign immunity. Similarly, Mr. Horn's statement that *Boron Oil* demonstrates that "[t]he Fourth Circuit precedent on the applicability of *Touhy* regulations to the nonparty government differs" from the caselaw cited by the plaintiff is simply incorrect. In fact, the Sixth Circuit did not even mention *Touhy* or its progeny in *In re Bankers Trust Co.*, 61 F.3d 465 (6th Cir. 1995). This was not due to oversight, but rather because that case, like the instant case, involved the discovery of documents that, while created by a federal banking regulatory agency, were *in the possession* of a non-governmental entity. In neither case was the federal agency itself being compelled to do *anything*.

Nor is the Supremacy Clause of the U.S. Constitution implicated by the plaintiff's motion to compel. Federal regulations should be given the force and effect of law when they are promulgated pursuant to a grant of authority by Congress. *Chevron U.S.A., Inc. v. Natural Resources Defense* Council, 467 U.S. 837 (1984). However, when, as here, these regulations exceed the administrative agency's statutory authority, the regulations are invalid. They are therefore without effect in all places, including state court, as well as federal court. The plaintiff has cited persuasive precedent in various jurisdictions, including two federal courts of appeals, to this effect. Moreover, the plaintiff has been unable to find *any* post *Bankers Trust* opinions that considered the issue and came to a contrary conclusion and, the government has cited none as well, but has relied only on inapposite authority as set forth above.

Sincerely yours,

Guy R. Bucci

GRB:ADG:kkp

cc:    Assistant U.S. Attorney Steven M. Horn
       Martin R. Smith, Esquire
       Ancil Ramey, Esquire
       John Polak, Esquire
       Carl S. Kravitz, Esquire

August 14, 2003

CHARLESTON, WV
2003 AUG 15 A 8:56
U.S. ATTORNEY

ATTORNEYS AT LAW
Guy R. Bucci
Timothy C. Bailey*
L. Lee Javins
J. Kristofer Cormany
Carrie L. Webster
* ALSO ADMITTED IN KENTUCKY

***Via Facsimile and Regular Mail***

John J. Polak, Esquire
Rose & Atkinson
P.O. Box 549
Charleston, WV 25322-0549

James Farnham, Esquire
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074

Martin R. Smith, Jr., Esquire
Smith & Thompson
P. O. Box 11178
Charleston, WV 25339

Ancil G. Ramey, Esquire
Steptoe & Johnson
P. O. Box 1588
Charleston, WV 25326

Stephen Horn
Assistant United States Attorney
P.O. Box 1713
Charleston, WV 25326

RE: Tallman v. City Holding, et al.
Civil Action No. 01-C-4090

Dear Counsel:

By this fax we are forwarding to you a copy of the Order regarding Plaintiff's Motion to Compel Production of "OCC" Document, entered today by Judge Walker and incident to the hearing of August 8, 2003.



BUCCI BAILEY & JAVINS

All Counsel
August 14, 2003
Page 2

The certified copy itself will follow by regular mail.

Sincerely yours,

Guy R. Bucci

GRB:cmw
cc: Aitan D. Goelman, Esquire w/Encl.
Carl S. Kravitz, Esquire w/Encl.

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

PAUL TALLMAN,

Plaintiff,

v.

Civil Action No. 01-C-4090
(Judge Walker)

CITY HOLDING COMPANY, et al.,

Defendants.

**ORDER REGARDING PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF "OCC" DOCUMENTS**

On the 8th day of August, 2003 came the plaintiff, by Carl S. Kravitz, Aitan D. Goelman and Guy R. Bucci, his counsel, the defendants City Holding Company and City National Bank of Charleston, West Virginia, by Martin R. Smith, Jr., their counsel, the director defendants, by John J. Polak and Stacy M. Colvin, their counsel, and defendants Day, Henson and Call, by Ancil G. Ramey, their counsel, and as well came the Office of the Comptroller of the Currency ("OCC"), appearing specially by its counsel, Stephen M. Horn, Assistant United States Attorney, for telephonic hearing on plaintiff's "Motion to Compel Defendants City Holding Company and City National Bank To Produce Office of Comptroller of the Currency Reports and Materials" ("Motion to Compel"). The Court, having previously heard oral argument on the Motion to Compel on August 4, 2003, and having reviewed all pre-hearing and post-hearing submissions by counsel for the parties and counsel for the OCC does find, conclude and ORDER as follows:

1. Within ten days of the telephonic hearing on August 8, 2003, plaintiff shall make a request of the OCC pursuant to 12 CFR § 4.33 for the production of the documents in question.

2. Pursuant to 12 CFR § 4.33(a)(2), plaintiff shall request that the OCC provide an expedited response to plaintiff's request.

3. Defendant City National Bank of Charleston, West Virginia ("CNB"), by mandatory compulsion of this order, shall inform the OCC that it does not object to plaintiff's request for the documents. CNB shall request that the OCC render a decision on an expedited basis. Furthermore, to the extent that the OCC determines, pursuant to 12 C.F.R § 4.35(c) or otherwise, that it is appropriate, in response to plaintiff's request to the OCC for the documents, that CNB should release the documents to plaintiff, rather than the Agency producing them to the plaintiff, CNB by mandatory compulsion of this order, shall do so.

4. CNB, in addition to its court-ordered obligations set forth in paragraph 3 above, shall, by further mandatory compulsion of this order, ask that the OCC, pursuant to 12 C.F.R. § 4.36(a) or other applicable provision of the regulations, exercise its discretion and authorize the release of the documents in question.

5. The parties shall report to the Court within 45 days of plaintiff's requests to the OCC as to the status of plaintiff's and CNB's requests to the OCC.

6. The Court shall defer its ruling on Plaintiff's Motion to Compel, including all arguments made in support and opposition thereto, until such time as the parties have reported to the Court as to the status of plaintiff's and CNB's requests to the OCC.

The objections of any party adversely affected by this Order are preserved and no party waives or compromises any rights or arguments that he or it might have by complying with the requirements of this Order. The Clerk is directed to transmit attested copies of this Order to all

counsel of record for the parties to this civil action and to Stephen M. Horn, Assistant United States Attorney, P.O. Box 1713, Charleston, WV 25326.

ENTERED this 14th day of August, 2003.

Jennifer Bailey Walker
Judge of the Circuit Court of Kanawha County

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE COPY FROM THE RECORDS OF SAID COURT.
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS 14
DAY OF Aug 2003
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

Prepared by:

John J. Polak (State Bar No. 2929)
ATKINSON MOHLER & POLAK, PLLC
300 Summers Street, Suite 1300
P.O. Box 549
Charleston, WV 25322-0549
(304) 346-5100

James E. Farnham
Stacy M. Colvin
HUNTON & WILLIAMS
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, VA 23219-4074
(804) 788-8200

Counsel for the Director Defendants





**U.S. Department of Justice**

*United States Attorney*
*Southern District of West Virginia*

*United States Courthouse*
*300 Virginia Street, East, Room 4000*
*Charleston, WV 25301*
*FAX: (304) 347-5443*

*Mailing Address*
*Post Office Box 1713*
*Charleston, WV 25326*
*(304) 345-2200*
*1-800-659 8726*

**BY HAND DELIVERY**
September 23, 2003

Honorable Jennifer Bailey Walker
Circuit Court of Kanawha County, West Virginia
111 Court Street, Judicial Annex
Charleston, WV 25301

Re: Tallman v. City National Bank of West Virginia
Civil Action No. 01-C-4090

Dear Judge Walker:

Please find enclosed a copy of the September 23, 2003, decision by the Office of the Comptroller of the Currency regarding plaintiff's request for examination reports and other non-public OCC information on City National Bank of West Virginia. It is my understanding that counsel of record are receiving a copy of this letter from the OCC and I am copying them as well.

If you have any questions, please feel free to contact me.

Sincerely yours,

KASEY WARNER
United States Attorney

By: [signature]
STEPHEN M. HORN
Assistant United States Attorney

SMH/cgb
Enclosure

cc: Aitan D. Goelman, Esq.
Guy R. Bucci, Esq.
Carl S. Kravitz, Esq.
John Polak, Esq.
James Farnham, Esq.
Martin R. Smith, Jr., Esq.
Timothy C. Bailey, Esq.
Ancil Ramey, Esq.
Gerald R. Francis, City National Bank

GOVERNMENT EXHIBIT E



Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

September 23, 2003

Aitan D. Goelman, Esq.
Zuckerman Spaeder LLP
1201 Connecticut Avenue
Washington, D.C. 20036-2638

Subject: Tallman v. City Holding Co., No. 01-C-4090 (Kanawha Cty Cir. Ct, W. Va.)

Dear Mr. Goelman:

This responds to your request of August 15, 2003, seeking examination reports and other non-public OCC information on City National Bank of West Virginia, Charleston, W. Va., for use in the above referenced litigation. You have submitted this request under 12 C.F.R. § 4.31 *et seq.* as counsel to plaintiff Paul Tallman.

Background

According to your request, this litigation is a shareholder derivative action against the bank's former management team and certain of its former and current directors. Among other things, the Complaint alleges that from 1998 through 2000 the defendants caused the bank to make increasingly risky and inappropriate loans, generating dramatic increases in non-performing loans and loan loss provisions. The Complaint also alleges that the defendants caused the bank to participate in the sub-prime lending market without properly managing the risk inherent in this business, and that the defendants mismanaged the securitization of sub-prime loans. According to the Complaint, the defendants failed to conduct adequate due diligence on the acquisition of Horizon Bancorp, and their acquisitions of banks in California were inappropriate under the circumstances. The Complaint also says defendants acquired internet, direct mail and insurance businesses in which the bank had no experience. As a result of these and other instances of alleged gross mismanagement by the defendants, the bank suffered damages and losses estimated in your request at $50 million.

In discovery, the bank produced to plaintiff Tallman, without OCC approval, the OCC's Nov. 18, 1996 examination report. Without filing an administrative request with the OCC as required by 12 C.F.R. 4.31 *et seq.*, the plaintiff petitioned the West Virginia court overseeing the case to order the bank to turn over additional OCC examination reports. The OCC objected that plaintiff had failed to exhaust his administrative remedies at the OCC and that the court had no authority to order the production of federal property. The court refused to grant the plaintiff's motion to compel, whereupon plaintiff filed this request with the OCC.

Decision

I regret that I must deny your request for failure to make an adequate showing under 12 C.F.R. § 4.33(a)(3)(iii)(B). This provision requires a showing that other evidence reasonably suited to the requester's needs is not available from any other source. Here, there is a plethora of other evidence, notably including the Formal Agreement entered into by the bank and the OCC in 2000 to correct deficiencies in the bank's operations. Unlike the OCC's examination reports and supervisory correspondence, the Formal Agreement is a public document under 12 U.S.C. § 1818(u)(1)(A), and the plaintiff can use it to show to support his case. Moreover, the Complaint itself reveals with considerable specificity how much other evidence is available. For example, ¶¶ 40-45 describe in detail the "staggering increases in loan loss provisions" in 1999 and 2000, citing the holding company's annual reports. Also cited in the Complaint is Chairman McLaughlin's interview in the *American Banker*, the deleterious effect of the merger with Horizon Bancorp and the losses incurred from the California acquisitions and the sub-prime loan business. Beyond the sources cited in the Complaint, the bank's Call Reports, the holding company's filings with the SEC and the testimony of bank officials should be available to make the desired showing.

Your request is premised on the belief that "the OCC apparently notified the bank in its 1997 and 1998 examination reports of deficiencies and weaknesses," and that the examination reports are not only "unique evidence of the underlying deficiencies" but also provide "actual evidence of notice to the defendants that things were wrong and needed to be fixed." Assuming that your characterization of the OCC examination reports is correct, you misinterpret the showing required by 12 C.F.R. § 4.33(a)(3)(iii)(B). This provision requires a showing that evidence <u>other than the OCC's examination reports</u> is unavailable. The uniqueness of the OCC examination reports is irrelevant. Here, as noted, a considerable amount of evidence other than OCC's reports does exist. Moreover, assuming that actual notice from the regulator is a basis for liability, there are other ways to show that directors and management are liable for mismanagement of the institution.

I am also denying your request for failure to make an adequate showing under 12 C.F.R. § 4.33(a)(3)(iii)(C). This provision requires you to show that your need for the information outweighs the public interest considerations in maintaining the information's confidentiality. Here, you have requested the OCC's examination reports and other supervisory communications in their entirety because you believe the OCC's conclusions, as distinguished from factual portions, are "the *most* relevant portions of the materials requested." (Emphasis in the original.) In effect, you wish to use the OCC's expert conclusions, which are clearly protected by the bank examination privilege. The reports are highly subjective, which leads me to believe that their disclosure might chill OCC examiners from exercising the candor so necessary for effective supervision. Since you can hire your own expert to weigh the considerable evidence available, I find that your need does not outweigh the public interest considerations in maintaining the reports' confidentiality.

Conclusion

For the reasons above, I must deny your request for non-public OCC information on this bank between 1996 and 2001. The bank must assure that the 1996 examination report produced without OCC approval be returned to the bank or to the OCC by any person in possession of an unauthorized copy, with no copies retained. I request that the bank inform the OCC (either Examiner in Charge Mark Blair or Assistant Director Ford Barrett) of its efforts to retrieve the report.

This is final agency action on your request. You may seek review of this decision in U.S. District Court under the Administrative Procedure Act, 5 U.S.C. 706(2).

Sincerely yours,

Timothy W. Long
Senior Deputy Comptroller
Mid-Size / Community Bank Supervision

cc: James Farnham, Esq.
Hunton & Williams
Riverfront Plaza, East Tower
Richmond, Va. 23219-4074

Ancil G. Ramey, Esq.
Steptoe & Johnson
P. O. Box 1588
Charleston, W. Va. 25326-1588

Martin R. Smith, Jr., Esq.
Smith & Thompson
900 Lee Street, Suite 804
Charleston, W. Va. 25339

Stephen M. Horn, Esq.
Assistant U. S. Attorney
U. S. Courthouse
P. O. Box 1713
Charleston, W. Va. 25326

Mr. Gerald R. Francis, Chief Executive Officer
City National Bank of West Virginia

IN THE CIRCUIT COURT
FOR KANAWHA COUNTY, WEST VIRGINIA

FILED
03 OCT -8 AM 9:14
CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

PAUL TALLMAN,

Plaintiff,

v.

CITY HOLDING COMPANY, et al.,

Defendants.

Civil Action No. 01-C-4090

**ORDER**

This matter is before the Court on the Plaintiff's Motion to Compel The Production of OCC Reports And Related Materials filed on June 18, 2003 ("Motion"). The Court conducted a hearing on the Motion on August 4, 2003, after which it entered its Order of August 14, 2003, deferring its ruling on the Motion for 45 days. The Court conducted a further hearing on the Motion on October 8, 2003, following notice that the Office of the Comptroller of the Currency ("OCC") had refused to release the documents under its regulations. None of the defendants opposes the Motion or objects to the production of the requested OCC materials. The OCC has been represented by Assistant United States Attorney Steven Horn, who has been permitted to participate in the hearings and make submissions to the Court and it asserts that the agency's regulations limit discovery of the materials in this action, even if they would otherwise be discoverable under the West Virginia Rules of Civil Procedure.

GOVERNMENT EXHIBIT F

The matter is now ripe and mature for decision. Upon consideration of the Motion, the arguments and authorities submitted by the parties and Assistant United States Attorney Horn on behalf of the OCC, and the OCC's objection, it is hereby, by the Court,

**ORDERED,** that the Plaintiff's Motion to Compel OCC Reports and Related Materials is **GRANTED**; and

**ORDERED**, that defendants City National Bank and City Holding Company ("City") shall produce the requested OCC documents to the plaintiff, by delivering copies to Guy R. Bucci's office no later than October 15th, 2003; and

**ORDERED**, that the OCC documents shall be treated as confidential under the protective order entered in this action; and

**ORDERED**, that the parties may retain copies of the OCC documents and use the documents for purposes of this litigation, subject to the limitations set forth in the protective order.

The Clerk is directed to transmit attested copies of this Order to all counsel of record.

**ENTERED** this 8th day of October, 2003.

Jennifer Walker Bailey, Judge
Circuit Court of Kanawha County

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE COPY FROM THE RECORDS OF SAID COURT.
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS 8
DAY OF Oct. 2003
CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

Submitted by:

Guy Bucci (State Bar No. 521)
BUCCI, BAILEY & JAVINS, L.C.
707 Virginia Street East, Suite 910
Charleston, WV 25301
(304) 345-0346 (phone)
(304) 345-0375 (fax)

Carl S. Kravitz (State Bar No. 7361)
Aitan D. Goelman (Pro Hac Vice)
ZUCKERMAN SPAEDER LLP
1201 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 778-1800 (phone)
(202) 822-8106 (fax)

Dated: October 6, 2003

GOVERNMENT
EXHIBIT
G

CASE 01-C-4090 KANAWHA

PAUL TALLMAN vs. CITY HOLDING COMPANY

| LINE | DATE | ACTION |
|---|---|---|
| 1 | 12/28/01 | # ISSUED SUM & 49 CPYS; F FEE; BUCCI FOR P; CK; RCPT 331719; |
| 2 | | # $95.00; CASE INFO SHEET; COMPLAINT |
| 3 | 02/11/02 | # COS AS TO P'S 1ST INTERROG'S & REQ FOR PROD TO CITY HOLDING |
| 4 | | # CO. & CITY NATL. BANK OF WV |
| 5 | 02/13/02 | @ SUBP W/RET (2/12/02 J.LARCH) AS TO ERNEST & YOUNG W/EXHS |
| 6 | 02/13/02 | $$ SUMMONS W/RET ( 2/11/02) AS TO CITY HOLDING CO, CITY NATIONAL |
| 7 | | BANK, SAMUEL BOWLING, D.K. CALES, MATTHEW CALL, HUGH CLONCH, |
| 8 | | STEVE DAY, MICHAEL DEAN, WILLIAM DOLIN, WILLIAM FILE, ROBERT |
| 9 | | FISHER, JAY GOLDMAN, DAVID HADEN, ALBERT TIECHE, PAUL TURMAN, |
| 10 | | MARY WILLIAMS, DAVID HAMBRICK, FRANK HARKINS, CARLIN HARMON, |
| 11 | | ROBERT HENSON, C. DALLAS KAYSERBARRY KEMERER, THOMAS LILLY, |
| 12 | | TIMOTHY MANCHIN, PHILLIP MCLAUGHLIN, HAROLD PAYNE, E.M. PAYNE, |
| 13 | | JAMES ROSSI, R.T. ROGERS, SHARON ROWE, MARK SCHAUL (SIGNED BY |
| 14 | | ALICE CARTE) |
| 15 | 02/15/02 | @ RULE 41 VOLUTARY DSMSL @ DEAN |
| 16 | 03/12/02 | # P'S MOT TO COMPEL 3RD PTY ERNST & YOUNG TO PROD DOCS W/EXH'S |
| 17 | | # & W/COS |
| 18 | 03/12/02 | # MOT FOR ADM TO PRACTICE; VERIFIED STATEMENT W/COS |
| 19 | 03/12/02 | # GENERAL OBJ OF CITY HOLDING CO. & CITY NATL. BANK OF WV TO P'S |
| 20 | | # 1ST INTERROG'S & REQ FOR PROD W/COS |
| 21 | 03/12/02 | # OBJ TO SUBP SERVED ON ERST & YOUNG, LLP W/COS |
| 22 | 03/14/02 | *O: KAREN DIETRICH ADM PRO HAC VICE OBO P/BER |
| 23 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III GEN. CSL. |
| 24 | | # SIGNED 3/12/02 FOR JAMES SONGER |
| 25 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 26 | | # 3/12/02 FOR CHARLES SMITH |
| 27 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 28 | | # 3/12/02 FOR MICHAEL SELLARDS |
| 29 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 30 | | # 3/12/02 AS TO PAT REED |
| 31 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 32 | | # 3/12/02 AS TO CURTIS MCCALL |
| 33 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 34 | | # 3/12/02 AS TO CLARENCE MARTIN |
| 35 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 36 | | # 3/12/02 AS TO JACK KLIN |
| 37 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 38 | | # 3/12/02 AS TO CAROL KABLE |
| 39 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 40 | | # 3/12/02 AS TO TRACY HYLTON, II |
| 41 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 42 | | # 3/12/02 AS TO ROBERT GRIST |
| 43 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 44 | | # 3/12/02 AS TO SCOTT GIBSON |
| 45 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 46 | | # 3/12/02 AS TO OSHEL CRAIGO |
| 47 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 48 | | # 3/12/02 AS TO PHILLIP CAIN |
| 49 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 50 | | # 3/12/02 AS TO JACK BAZEMORE |
| 51 | 03/18/02 | # SUM W/ATTACH COPY OF RMR AS TO JOHN ALDERMAN, III SIGNED |
| 52 | | # 3/12/02 AS TO JACK ALLEN |
| 53 | 03/18/02 | * ORDER MAILED; 3/14/02 JR |
| 54 | 03/19/02 | # P'S MOT TO COMPEL W/EXH'S & COS |
| 55 | 03/20/02 | # MOT FOR PARTIAL SJ W/EXH & COS |
| 56 | 03/20/02 | # MOT TO REQUIRE P TO POST BOND W/EXH'S & COS |
| 57 | 03/20/02 | # MOT TO DIS W/COS |
| 58 | 03/12/02 | # MOT FOR ADM PRO HAC VICE W/EXH'S & COS |
| 59 | 03/15/02 | # NOT OF HRG W/COS; |

60 03/25/02 # D'S MOT FOR PROT O W/ATTACH & COS
61 03/25/02 # NOT OF HRG W/COS; NOT OF HRG W/COS
62 03/25/02 # COS AS TO NOT OF DEPO
63 03/26/02 # NOT OF SCHED CONF W/COS
64 03/26/02 # AMD NOT OF HRG W/COS; AMD NOT OF HRG W/COS
65 04/25/02 + O MAILED COUNSEL OF REC; ELLIOTT HICKS, COMM; S/3-22-02/BERGER
66 03/22/02 *O: MATTER REF TO E. HICKS/BER
67 03/28/02 # NOT OF HRG W/COS;
68 03/29/02 # ENVELOPE AS TO CARL KRAVITZ RET MARKED "INSUFFICIENT ADD"
69 04/05/02 # ERNST & YOUNG'S RESP TO P'S MOT TO COMPEL & MOT FOR PROT O
70 # W/EXH'S & COS
71 04/09/02 @ P'S OPPO T D'S MOT F PRTCTV ORDR W/ATTACHS W/COS
72 04/09/02 @ AFDVT O KRAVITZ N SPRT O P MOT T COMPL 3RD PRTY ERNST T PROD
73 @ DOCS W/EXHS W/COS
74 04/15/02 *O: KAREN DIETRICH ADM PRO HAC VICE/BER
75 04/15/02 *O: JAMES FARNHAM & STACY COLVIN ADM PRO HAC VICE/BER
76 04/15/02 @ 2 ORDER MAILED 4/17/02; 4/15/02; BY AH
77 04/23/02 # D'S MOT TO EXCEED PAGE LIMIT W/COS;
78 04/23/02 # D'S MEMO IN SUPP OF MOT W/COS
79 04/23/02 # D'S MEMO IN SUPP OF MOT W/EXH & COS
80 04/23/02 # D'S MEMO IN SUPP OF MOT FOR PARTIAL SJ W/COS
81 05/06/02 # MEMO IN SUPP OF STATE AUTO INS. CO'S MOT TO INTERVENE; COS AS
82 # TO MOT TO INTERVENE & MEMO IN SUPP
83 05/06/02 # STATE AUTO INS. CO'S MOT TO INTERVENE W/EXH
84 05/07/02 $$ ORDER DTD 5/6 DLVD BY CML 5/7
85 05/07/02 *SO: TD 7/7/03; CONF 6/13/03/BER (S/5/6)
86 05/13/02 # ENVELOPE AS TO MICHAEL CAVADEL RET MARKED "INSUFFICIENT ADD"
87 05/17/02 # 1ST AMD C
88 05/17/02 # P'S OPPOS TO D'S MOT TO DIS W/EXH'S & COS
89 05/17/02 # P'S MOT FOR LEAVE TO EXCEED PAGE LIMIT W/COS
90 05/17/02 # P'S OPPOS TO MOT TO REQUIRE P TO POST BOND W/COS
91 05/17/02 # P'S OPPOS TO MOT FOR PARTIAL SJ W/EXH & COS
92 05/20/02 # P'S OBJ'S TO RECOMMENDATION OF SPECIAL COMMISSIONER
93 # W/EXH'S & COS
94 05/20/02 # RECOMMENDATION OF SPECIAL COMMISSIONER
95 05/21/02 # D'S OBJ TO & MOT TO STRIKE P'S OPPOS TO D'S MOT TO DIS &
96 # MOT FOR PARTIAL SJ W/COS
97 05/21/02 # NOT OF HRG W/COS;
98 05/21/02 # COV LET; PRAECIPE; AFD W/EXH & W/COS
99 05/22/02 *O: CT ACCEPTS REC OF SPEC COMM/BER (S/5/21)
100 05/22/02 @ ORDER MAILED 5/23/02; 5/21/02; BY AH
101 05/24/02 # P'S OPPOS TO D'S OBJ TO & MOT TO STRIKE P'S OPPOS' TO
102 # MOT'S & MOT FOR LEAVE TO ADD PLAINTIFF W/COS
103 05/24/02 # NOT OF HRG W/COS
104 05/24/02 # COS AS TO 1ST AMD C W/COS
105 05/24/02 # D'S REPLY MEMO IN SUPP OF MOT W/COS
106 05/24/02 # D'S REPLY MEMO IN SUPP OF MOT TO DIS W/COS
107 05/30/02 # P'S FURTHER RESP IN SUPP OF THEIR OPPOS TO D'S MOT TO DIS
108 # W/ATTACH'S W/COS
109 06/03/02 # D'S MOT TO TRANSFER W/EXH'S & COS
110 06/12/02 # COS AS TO D'S ANS' TO SCOTT ANDREWS 1ST INTERROG'S TO CITY
111 # HOLDING CO. & CITY NATL. BANK
112 06/14/02 # D'S SUPP REPLY MEMO IN SUPP OF MOT W/EXH & COS
113 06/17/02 RC/**CASE REASSIGNMENT FROM JUDGE BERGER TO JUDGE WALKER**
114 07/05/02 # NOT OF SCHED CONF W/COS
115 07/05/02 # NOT OF HRG W/COS
116 07/09/02 # ENVELOPE AS TO CARL KRAVITZ RET MARKED "INSUFFICIENT ADD"
117 08/06/02 # P'S RESP TO D'S REPLY & SUPP MEMO REGARDING MOT TO REQUIRR
118 # P TO POST BOND W/COS
119 08/07/02 # LET FR JUDGE BERGER TO CNSL DTD 8/7/02
120 08/13/02 # D'S REPLY TO P'S RESP TO D'S REPLY & SUPP MEMO W/EXH & COS
121 08/21/02 # TRANS OF HRG HELD ON 6/3/02 BEFORE JUDGE BERGER
122 08/22/02 - ORDER MAILED TO M. SMITH, J. FARNHAM, G. BUCCI, C. KRAVITZ;
123 8/22/02; LJ
124 08/22/02 *O: SCOTT ANDREWS DROPPED AS PARTY P/WALKER
125 09/03/02 # ENVELOPE AS TO CARL KRAVITZ RET MARKED "INSUFFICIENT ADD"

09/05/02 = ORDER MAILED TO G. BUCCI, M. SMITH; 9/4/02; LJ
09/04/02 #@SO: TD 10/27/03, CONF 10/6/03/WALKER
09/16/02 # ENVELOPE AS TO CARL KRAVITZ RET MARKED "INSUFFICIENT ADD"
09/23/02 # NOT OF HRG W/COS
12/03/02 # D'S INITIAL IDENTIFICATION OF FACT WIT'S W/COS
12/03/02 # TRANS OF HRG HELD ON 8/22/02 BEFORE JUDGE WALKER
12/13/02 # COV LET; COS AS TO P'S INITIAL IDENTIFICATION OF FACT WIT'S
12/24/02 # P'S MOT FOR STATUS CONF & O ADJUSTING DEADLINES W/ATTACH & COS
01/16/03 # NOT OF STATUS CONF W/COS
04/04/03 # NOT OF MOT; P'S MOT TO COMPEL W/EXH'S & COS
04/14/03 # NOT OF APPEARANCE W/COS
04/15/03 # TRANS OF HRG HELD ON 3/26/03 BEFORE JUDGE WALKER
04/15/03 # TRANS OF HRG HELD ON 3/14/03 BEFORE JUDGE WALKER
04/17/03 # NOT OF HRG W/COS
05/01/03 # NOT OF APPEARANCE W/COS
05/16/03 # P'S SUPP MEMO IN SUPP OF UNOPPOSED MOT TO COMPEL W/EXH & COS
05/16/03 # MEMO ADDRESSING OBJ'S TO PROPOSED O W/EXH & COS
05/19/03 # APPLICATION FOR ADM PRO HAC VICE; NOT OF HRG W/COS, WRITTEN # STATEMENT; VERIFIED STATEMENT W/COS
05/23/03 *MOT TO CERTIFY QUEST W/ATT & COS
05/29/03 = ORDER MAILED TO M. SMITH, J. POLAK, J. FARNHAM, A. RAMEY, G. BUCCI, C. KRAVITZ; 5/19/03; LJ
05/19/03 *O: PROT O/WALK
05/19/03 *O: SUBST OF CNSL/WALK
05/19/03 *O: DENYING MOT TO DISM/WALK
05/19/03 *O: AITAN GOELMAN ADM PRO HAC VICE/WALK
06/05/03 = ORDERS (2) MAILED TO C. KRAVITZ, G. BUCCI, A. RAMEY, J. POLAK, J. FARNHAM, M. SMITH; 6/2/03; LJ
06/03/03 *O: MOT TO COMPEL GRT/WALK (S/6/2)
06/03/03 *SO: TD 7/12/04; CONF 6/28/04/WALK (S/6/2)
06/06/03 # P'S OPPOS TO D'S MOT TO CERTIFY QUESTION TO WVSCA W/COS
06/17/03 # ANS OF INDIVIDUAL D'S TO 1ST AMD C W/COS
06/16/03 # ANS & IN ALTERNATIVE REQ W/COS
06/18/03 # NOT OF MOT (6/30/03 @ 9:30 AM); P'S MOT TO COMPEL # W/EXH'S & COS
06/18/03 # APPENDIX OF NON-WV AUTHORITY IN SUPP OF P'S MOT TO COMPEL
06/23/03 = ORDER MAILED TO J. POLAK, A. NASON, J. FARNHAM, M. SMITH, A. RAMEY, G. BUCCI, C. KRAVITZ; 6/19/03; LJ
06/23/03 <O: DISCOVERY REFERRED TO ANDREW NASON AS SPEC COMM//WALKER (S6/19/03)
06/23/03 # COV LET; COS AS TO PAUL TALLMAN'S 1ST REQ FO RPROD TO D'S, DAY # HENSON & CALL
06/23/03 # COV LET; COS AS TO PAUL TALLMAN'S 1ST REQ FO RPROD TO DIRECTOR # D'S
06/23/03 # NOT OF HRG W/COS (6/30/03 @ 9:30 AM)
06/25/03 # RESP OF CITY NATL. BANK & CITY HOLDING TO P'S MOT TO COMPEL # W/COS
06/30/03 # NOT OF MOT (7/14/03 @ 1:30 PM); P'S MOT TO COMPEL W/COS
07/07/03 # NOT OF MOT (7/14/03 @ 1:30 PM); P'S MOT TO ENFORCE CIRCUIT # COURT'S 6/3/03 O & FOR SANCTIONS W/EXH'S & COS
07/07/03 # NOT OF MOT (7/14/03 @ 1:30 PM); P'S MOT TO COMPEL W/EXH'S & # W/COS
07/11/03 # COS AS TO DIRECTOR D'S 1ST INTERROG'S TO P
07/11/03 # COS AS TO DIRECTOR D'S 1ST REQ FOR PROD TO P
07/15/03 = ORDER MAILED TO J. POLAK, J. FARNHAM, M. SMITH, A. RAMEY, G. BUCCI, C. KRAVITZ; 7/11/03; LJ
07/15/03 # P'S REPLY TO RESP OF CITY NATL. BANK & CITY HOLDING CO. TO P'S # MOT TO COMPEL W/EXH & COS
07/14/03 <O: DENYING MOT TO CERTIFY/WALKER (S7/11/03)
07/15/03 # RESP OF DAY, HENSON & CALL TO MOT TO COMPEL W/COS
07/18/03 # SUPP RESP OF CITY NATL. BANK & CITY HOLDING CO. TO P'S MOT TO # COMPEL W/COS
07/18/03 # P'S REPLY TO RESP OF DAY, HENSON & CALL TO P'S MOT TO COMPEL # W/COS
07/28/03 CB/COS AS TO RESP TO P'S 1ST SET OF REQ FOR PROD; TO DIRECTOR D'S BY D'S DAY CALL & HENSON

192 07/29/03 CB/OBJ TO REPORT OF DISCOVERY COMMISSIONER; W/COS
193 07/29/03 CB/NOT OF AGR TO WITHDRAW P'S MOTION FOR SANTIONS; W/COS & EXH'S
194 07/30/03 CB/D'S MOTION TO REMOVE ANDREW NASON AS DISC COMMISSIONER & TO
195 VACATE THE REPORT OF DISC COMMISSIONER; W/COS & EXH'S
196 07/31/03 # RESP OF ANDREW NASON TO MOT OF CITY HOLDING CO. W/COS
197 08/04/03 # NOT OF MOT W/COS
198 08/04/03 # P'S RESP TO CITY'S OBJ'S TO REPORT OF DISCOV COMMISSIONER
199 # & TO DISQUALIFY COMMISSION W/COS
200 08/04/03 # P'S EXH'S
201 08/05/03 = ORDERS (2) MAILED TO G. BUCCI, C. KRAVITZ, J. POLAK, M. SMITH,
202 J. FARNHAM, A. RAMEY; 8/4/03; LJ
203 08/04/03 *O: P MOT TO COMPEL GRT/WALK
204 08/04/03 *O: P MOT TO ENFORCE CT'S RULING GRT/WALK
205 08/13/03 = ORDER MAILED TO G. BUCCI, C. KRAVITZ, A. RAMEY, J. POLAK,
206 M. SMITH, J. FARNHAM, A. MACQUEEN; 8/11/03; LJ
207 08/14/03 # COS AS TO NOT TO TAKE DEPO
208 08/14/03 # COS AS TO NOT TO TAKE DEPO
209 08/11/03 <O: APPTING A. ANDREW MACQUEEN AS SPECIAL COMMISSIONER/WALKER
210 08/14/03 <O: RE P'S MOT TO COMPEL/WALKER
211 08/26/03 # COS AS TO D'S, DAY, HENSON & CALL'S ANS' TO P'S 1ST REQ FOR
212 # PROD
213 08/27/03 # COV LET; COS AS TO PAUL TALLMAN'S RESP TO DIRECTOR D'S
214 # 1ST INTERROG'S; COS AS TO PAUL TALLMAN'S RESP TO DIRECTOR
215 # D'S 1ST REQ FOR PROD
216 08/29/03 # COS AS TO NOT TO TAKE DEPO
217 08/29/03 # COS AS TO NOT TO TAKE DEPO
218 09/02/03 # COS AS TO D'S, DAY, HENSON & CALL'S 1ST AND ANS TO P'S
219 # 1ST REQ FOR PROD
220 09/10/03 # COS AS TO ACCEPTANCE OF SERVICE; ACCEPTANCE OF SERVICE
221 # OF SUBP'S (NO DATE - PER) AS TO TOM MCGINNIS; (NO DATE - PER)
222 # AS TO BERNARD MCGINNIS
223 09/18/03 # NOT OF HRG (9/23/03 @ 9:10 AM); APPLICATION TO DEPOSE OUT-OF-
224 # STATE-WIT W/ATTACH & COS
225 09/18/03 # COS AS TO NOT TO TAKE DEPO
226 09/22/03 <O: AUTHORIZING DEPO OF OUT OF STATE WITNESS/WALKER
227 09/23/03 $ORDER MAILED 9/22/03 BY LA
228 09/26/03 # SUBP FOR DEPO W/RET (9/24/03 SP) AS TO CITYNET WV, LLC
229 09/30/03 # NOT OF DEPO W/ATTACH & COS;
230 10/01/03 # NOT OF MOT (10/8/03 @ 8:30 AM) W/COS
231 10/01/03 # NOT OF HRG W/COS (10/9/03 @ 8:30 AM)
232 10/03/03 # COV LET; RET OF SERVICE OF SUBP (10/2/03 SP) AS TO JACKSON
233 # & ASSOCIATES

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

SCOTT W. ANDREWS and
PAUL TALLMAN, SR.

Plaintiffs,

v.

Civil Action No. ____________
(Civil Action No. 01-C-4090
Circuit Court of Kanawha Co.
Judge Walker)

CITY HOLDING COMPANY, CITY NATIONAL BANK OF WEST VIRGINIA, JACK ALLEN, JACK BAZEMORE, SAMUEL BOWLING, PHILLIP CAIN, D.K. CALES, MATTHEW CALL, HUGH CLONCH, OSHEL CRAIGO, STEVEN DAY, WILLIAM DOLIN, WILLIAM FILE, ROBERT D. FISHER, SCOTT GIBSON, JAY GOLDMAN, ROBERT GRIST, DAVID HADEN, DAVID HAMBRICK, FRANK HARKINS, CARLIN HARMON, ROBERT HENSON, TRACY HYLTON, II, CAROL KABLE, C. DALLAS KAYSER, BARRY KEMERER, JACK KLIM, THOMAS LILLY, TIMOTHY MANCHIN, CLARENCE MARTIN, CURTIS McCALL, PHILLIP McLAUGHLIN, HAROLD PAYNE, E.M. PAYNE, III, PAT REED, JAMES ROSSI, R.T. ROGERS, SHARON ROWE, MARK SCHAUL, MICHAEL SELLARDS, CHARLES SMITH, JAMES SONGER, ALBERT TIECHE, PAUL TURMAN, II, CECIL WILLIAMS, and MARY WILLIAMS,

Defendants.

CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing "PETITION FOR AND NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. § 1442(a)(1)" was made this 8th day of October, 2003, by mailing a true copy properly addressed thereof to the following:

Timothy C. Bailey, ESq.
Guy R. Bucci, Esq.
Bucci Bailey & Jarvis, LC
P.O. Box 3712
Charleston, WV  25337

Carl S. Kravitz, Esq.
Zuckerman Spaeder, LLP
1201 Connecticut Avenue, NW
Washington, DC  20036-2638

Martin R. Smith, Jr., Esq.
Smith & Thompson
900 Lee Street
Huntington Square, Suite 804
Charleston, WV  25339

Ancil Ramey, Esq.
Steptoe & Johnson
P.O. Box 1588
Charleston, WV  25326

John Polak, Esq.
Rose & Atkinson
P.O. Box 549
Charleston, WV  25322


STEPHEN M. HORN
Assistant United States Attorney

**IN THE CIRCUIT COURT FOR KANAWHA COUNTY, WEST VIRGINIA**

SCOTT W. ANDREWS,

Plaintiff,

v.

Civil Action No. 01-C-4090
Berger

CITY HOLDING COMPANY, CITY NATIONAL BANK OF WEST VIRGINIA, JACK ALLEN, JACK BAZEMORE, SAMUEL BOWLING, PHILLIP CAIN, D.K. CALES, MATTHEW CALL, HUGH CLONCH, OSHEL CRAIGO, STEVEN DAY, MICHAEL DEAN, WILLIAM DOLIN, WILLIAM FILE, ROBERT D. FISHER, SCOTT GIBSON, JAY GOLDMAN, ROBERT GRIST, DAVID HADEN, DAVID HAMBRICK, FRANK HARKINS, CARLIN HARMON, ROBERT HENSON, TRACY HYLTON, II, CAROL KABLE, C. DALLAS KAYSER, BARRY KEMERER, JACK KLIM, THOMAS LILLY, TIMOTHY MANCHIN, CLARENCE MARTIN, CURTIS McCALL, PHILLIP McLAUGHLIN, HAROLD PAYNE, E.M. PAYNE, III, PAT REED, JAMES ROSSI, R.T. ROGERS, SHARON ROWE, MARK SCHAUL, MICHAEL SELLARDS, CHARLES SMITH, JAMES SONGER, ALBERT TIECHE, PAUL TURMAN, II, CECIL WILLIAMS, and MARY WILLIAMS,

Defendants.

**VERIFIED DERIVATIVE COMPLAINT**

Plaintiff Scott W. Andrews ("Plaintiff"), by his attorneys, for his complaint, alleges upon personal knowledge as to himself and his own acts, and as to all other matters upon information

and belief based upon, *inter alia*, the investigation made by and through his attorneys, as follows:

**Introduction**

1. This is a derivative and double derivative action brought pursuant to the common law on behalf of the shareholders of City Holding Company ("CHCO") and its wholly-owned subsidiary City National Bank of West Virginia ("City National"). This action is brought for the benefit of CHCO and City National against certain of their directors and officers (the "Individual Defendants"), and no claims of wrongdoing are asserted against CHCO and City National. This action complains of a course of conduct in which the Individual Defendants have acted directly or indirectly in violation of the respective duties of care and fiduciary duties of care and loyalty owed to CHCO and City National.

2. As set forth in greater detail below, this Complaint alleges that the Individual Defendants have grossly mismanaged and failed to properly supervise the various divisions and departments, employees and agents of CHCO and City National. In addition, despite facts brought to the Individual Defendants' attention, and despite their independent obligation to do so, the Individual Defendants failed to ensure the effective implementation of the most basic systems designed to bring to light and prevent the mismanagement which occurred. The Individual Defendants thereby breached their fiduciary duties and acted in negligent, grossly negligent, reckless and/or intentional disregard of the injury and risk of loss they were inflicting upon CHCO and City National.

3. As a result of the gross mismanagement, negligence, recklessness and/or intentional misconduct and other breaches of duty by the Individual Defendants, CHCO and City National have suffered significant damages, including losses of tens of millions of Dollars. The

actions of the Individual Defendants have exposed CHCO and City National to extensive investigation and supervision by federal banking agencies and other damages.

**Parties**

4. Plaintiff Scott W. Andrews is and was at all relevant times a shareholder of CHCO.

5. CHCO is incorporated under the laws of West Virginia and maintains its headquarters in Charleston, West Virginia. CHCO is a multi-bank holding company that provides various financial products and services to consumers and business.

6. City National is a National Bank and has its principal place of business in Charleston, West Virginia. City National is a wholly owned subsidiary of CHCO.

7. At the relevant times, the following Individual Defendants held the following positions at CHCO and City National:

Jack Allen, Former City National Director

Jack Bazemore, Former City National Director

Samuel M. Bowling, CHCO Director, City National Director

Phillip W. Cain, Former CHCO Director

D. K. Cales, Former CHCO Director

Matthew Call, Former CHCO Executive Vice President

Hugh R. Clonch, CHCO Director

Oshel Craigo, City National Director

Steven J. Day, Former CHCO Director and President/CEO; Former City National Director

Michael D. Dean, Former CHCO Senior Vice President (Finance) and Principal Accounting Officer

William C. Dolin, Former CHCO Director

William File, City National Director

Robert D. Fisher, CHCO Director

Scott Gibson, Former City National Director

Jay C. Goldman, CHCO Director

Robert E. Grist, City National Director

David E. Haden, CHCO Director

David W. Hambrick, CHCO Director

Frank S. Harkins, CHCO Director

Carlin K. Harmon, Former CHCO Director

Robert A. Henson, Former CHCO Chief Financial Officer

Tracy W. Hylton, II, CHCO Director

Carol Kable, Former City National Director,

C. Dallas Kayser, CHCO Director

Barry Kemerer, Former City National Director

Jack Klim, Former City National Director

Thomas E. Lilly, Former City National Director

Timothy J. Manchin, Former City National Director

Clarence Martin, Former City National Director

Curtis McCall, Former City National Director

Philip L. McLaughlin, CHCO Director and Chairman of the Board

Harold Payne, Former City National Director

E. M. Payne, III, CHCO Director

Pat Reed, Former City National Director

James Rossi, City National Director

R. T. Rogers, CHCO Director

Sharon H. Rowe, City National Director

Mark H. Schaul, Former CHCO Director

Michael Sellards, Former City National Director

Charles Smith, Former City National Director

James E. Songer, CHCO Director

Albert M. Tieche, CHCO Director

Paul Turman II, Former City National Director

Cecil Williams, Former City National Director

Mary Hooten Williams, City National Director

**Derivative Allegations**

8. Plaintiff brings this action derivatively on behalf of and for the benefit of CHCO and City National to redress injuries suffered and to be suffered by CHCO and City National as a direct result of the breaches of fiduciary duties of care and loyalty and gross corporate mismanagement, negligence, recklessness and/or intentional misconduct by the Individual Defendants.

9. Plaintiff will fairly and adequately represent the interests of CHCO and City National and has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

10. Plaintiff did not make a demand on the CHCO Board or the City National Board (collectively the "Boards") to bring this action because such demand would be futile and is excused.

11. Of the Individual Defendants who were members of CHCO's Board of Directors ("CHCO Board") during the time of the wrongdoing complained of herein, fourteen are currently members of the twenty-one member current CHCO Board. Thus two-thirds of the current CHCO Board of Directors are defendants herein.

12. Of the Individual Defendants who were members of City National's Board of Directors ("City National Board") during the time of the wrongdoing complained of herein, seven are members of the eight-member current City National Board. Only one member of the current eight-member City National Board of Directors is not a defendant herein.

13. Thus, demand would be futile because an overwhelming majority of the current Boards were members of the Boards at the time of the alleged wrongdoing and either negligently, intentionally or recklessly:

a. directly participated in the wrongs alleged herein;

b. ignored the clear mismanagement that was taking place;

c. failed to diligently review and oversee the company's investments and business decisions;

d. and/or failed to adopt reasonable internal controls and independent monitoring systems over the business.

14. Moreover, all of the current members of the Boards have long known of the wrongful acts at issue and have done nothing by way of litigation to recoup the damages suffered by CHCO and City National. The current members of the Boards were either already members of the Board when the wrongdoing alleged herein occurred or became members of the Boards at the time the bank recognized the wrongdoing and caused the removal of certain officers and directors responsible for the gross mismanagement. However, despite the availability of substantial directors' and officers' liability insurance, these directors took no action by way of litigation to redress the injuries suffered by CHCO and City National.

15. Moreover, the Boards would not act to sue defendant Steven J. Day (the former President of CHCO) ("Day") or his former management group or themselves. The CHCO Board retained Day and his managers - and it gave them new lucrative long-term contracts on December 31, 1998 - after it became apparent that they were not competent management. Despite their gross mismanagement of CHCO, the CHCO Board later gave Day and others lucrative severance packages upon their departure from the bank.

16. To the extent CHCO and City National currently maintain or previously maintained insurance coverage for directors' and officers' liability ("D & O liability"), the Boards have further incentive to decline to bring suit against the Individual Defendants on behalf of CHCO and City National. Modern D & O liability policies typically exclude coverage when the insured corporation brings suit in its own name against the insured directors and officers. This typical "insured insured" exclusion would leave all liability in this action to the Individual Defendants personally, including those who are current members of either Board, in the event CHCO and City National brought direct claims against the Individual Defendants. In contrast,

derivative plaintiffs would typically not be subject to the exclusion, thereby making available substantial insurance to redress the harm to CHCO and City National.

17. Because a majority of the current members of the current Board of Directors would face a substantial likelihood of personal liability and/or are self-interested in the decision to pursue - or not to pursue - this action on behalf of CHCO and City National, they cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action.

**Factual Allegations**

18. As of the beginning of 1998, CHCO and City National Bank publicly disclosed financial statements that indicated they were healthy, growing businesses. Just two and a half years later, CHCO had suffered catastrophic losses in virtually all of its markets and was forced to submit to stringent oversight by federal banking regulators.

19. CHCO's share price went from a high of over $50 per share in 1998 to a low of under $7 two years later, reducing the company's market capitalization by almost $700 million in just two years. Similarly, its annual net income slipped from $26.29 million in 1997 to a net loss of $38.4 million in 2000, with an additional net loss of $25.8 million reported for the first six months of 2001. In 2000 alone, CHCO was forced to record $43.1 million in one-time charges against earnings in order to account for improperly made investments.

20. As of the beginning of 1998, CHCO's President and Chief Executive Officer was Individual Defendant Steven J. Day ("Day"). Individual Defendant Robert Henson ("Henson") was Chief Financial Officer, and Individual Defendant Matthew Call ("Call") was Executive Vice President.

21. During 1998 and 1999 and through June 2000, Day, Henson, Call and other high level executives of CHCO and City National (the "management team") ran the operations of CHCO and City National. The CHCO or City National Boards did not provide adequate supervision and oversight of CHCO's and City National's management teams and failed to ensure that CHCO and City National had proper internal controls and procedures.

22. As further set forth below, CHCO's community banking loan portfolio was grossly mismanaged during 1998 and 1999 by the management team, causing CHCO to lose millions of Dollars and causing its loan loss allowances to increase dramatically between 1998 and 2001.

23. Upon information and belief, the management team caused CHCO and City National to make a number of inappropriate, high risk loans to businesses in which, upon information and belief, members of the management team, their families or close associates held ownership interests.

24. The management team also caused CHCO and City National to originate or acquire a substantial pool of inappropriate loans.

25. Many of the loans made by or at the behest of the management team later had to be written off as non-performing loans at a loss of millions of Dollars to CHCO.

26. As further alleged below, the management team also caused CHCO's community banking division to acquire two California bank franchises in 1998 and 1999 that ultimately proved unprofitable and caused CHCO to suffer extensive losses.

27. As further alleged below, the management team also caused CHCO's involvement in a number of deals involving substantial investment in the highly risky sub-prime mortgage market and the pooling and securitization of such sub-prime loans. Ultimately

millions of Dollars had to be written off as losses to CHCO and City National as a result of the involvement in the sub-prime mortgage market.

28. As further set forth below, the management team also led CHCO in its careless acquisition - without appropriate Board supervision - of a number of unprofitable non-banking related ventures which ultimately caused CHCO a loss of millions of Dollars.

29. In approximately June 2000, then-Director and President/CEO Steven J. Day was removed from his position by a "no confidence" vote of the CHCO Board of Directors. From and after that time, plaintiff discovered that CHCO's and City National's catastrophic losses over the previous two years were a direct result of the gross mismanagement and negligent Board oversight of CHCO's and City National's business affairs.

30. With respect to the above transactions, the Boards failed in their oversight, strategic planning and business development roles.

**Community Banking Loan Mismanagement:**

31. From 1998 through 2000, the management team caused CHCO to make and acquire increasingly risky and inappropriate loans, causing dramatic increases in non-performing loans, loan loss provisions and loan loss allowances. Indeed, in 1998, CHCO's Board acknowledged the high risk associated with its loan practices, stating that the loan loss provision increases in 1998 were due to "credit quality deterioration" and "other credit quality issues." The Boards and management sacrificed safe and sound banking practice in order to pursue their high risk strategies.

32. Because of the increasingly high risk loans made and acquired by CHCO, CHCO was forced to record increasing loan loss provisions between 1997 and 2000. In 1998, loan loss

provisions increased by 109% over 1997, from $4.06 million to $8.48 million. In 1999, CHCO had to record additional loan loss provisions of $19.29 million. In 2000, CHCO recorded an additional $25.48 million in loan losses.

33. The staggering increases in loan loss provisions in 1999 and 2000 are partly due to the mismanagement of the loan loss allowance in 1998. Although CHCO took almost $10 million in charges against earnings in connection with its 1998 merger with Horizon Bancorp, the subsequent loan loss allowance for the combined entity was stated as being lower in 1998 than it had been for CHCO alone in 1997 ($17.61 million in 1998; $18.19 million in 1997). As a result, CHCO was forced to increase its loan loss allowance dramatically to $27.11 million in 1999.

34. In addition, despite a statement by the CHCO Board of Directors at the end of 1999 that "management believes that the consolidated allowance for loan losses at December 31, 1999, is adequate to provide for losses inherent in the ... loan portfolio," CHCO was forced to further increase its loan loss allowance in 2000, to $40.63 million. By June 30, 2001, CHCO's non-performing assets had reached a value of $40.6 million and the loan loss allowance had been increased, yet again, to $45.7 million, thus sending the allowance for loan loss as a percentage of total average loans from 1.21% in December 1997 to a staggering 2.43% in June 2001.

35. Similarly, CHCO was forced to take increasingly substantial charges against earnings for non-performing loans between 1998 and 2001. In 1997, CHCO charged off $3.28 million in loans; in 1998, that number increased by 200% to $9.85 million, and in 1999, an additional $10.52 million were charged off. In 2000, CHCO wrote off $11.96 million in non-performing loans, and by June 2001, an additional $12.5 million were charged off.

36. As a result of the gross mismanagement of CHCO and City National, the OCC in July 2000 required CHCO to submit to a three-year strategic plan to improve loan portfolio management. Among other things, the OCC required that CHCO improve its loan portfolio management, strengthen internal controls and audit committees, and establish a program to maintain adequate allowances for loan losses. In addition, the OCC required CHCO to discontinue its involvement in the issuance of brokered deposits, a high risk venture in which CHCO became involved in 1999.

37. In 2001, CHCO's current Board of Directors acknowledged that CHCO had significant problems with commercial loans and indirect car loans until its involvement in these markets was discontinued in 2000.

**Mismanagement of Community Banking Acquisitions:**

38. In addition to its loan mismanagement, the Community Banking segment of CHCO's business lost millions of Dollars as a result of the acquisition of banks in California.

39. In 1998, CHCO acquired Del Amo Savings Bank ("Del Amo") at a cost of 261,000 shares of CHCO stock (then worth approximately $12.36 million).

40. In 1999, CHCO acquired Frontier Bancorp and its wholly-owned subsidiary Frontier State Bank ("Frontier") at a cost of $15.13 million in cash.

41. On information and belief, the bank had little or no expertise or experience in California real estate lending. The California acquisitions were inappropriate, given City National's size, expertise and experience. The CHCO Board failed in its oversight, strategic planning and business development functions.

42. In 2000, Del Amo recorded a net loss of $4.5 million, and Frontier recorded a net loss of almost $8 million.

43. In 2000, CHCO did an abrupt about-face and decided to divest its ownership of these California franchises. In order to more accurately state the California banks' values, CHCO took a $13.64 million charge against earnings in 2000, and the California banks were offered for sale.

44. As of August 2001, CHCO had reached an agreement to sell the California bank franchises at a loss for $23 million.

**Mortgage Banking:**

45. The gross mismanagement and breaches of duty by the Individual Defendants also occurred in CHCO's mortgage banking segment.

46. CHCO's mortgage division, City Mortgage Services, was formed in August 1996 and expanded to California in December 1996. Initially the division was engaged primarily in servicing high risk loans for other lenders.

47. In late 1997, the Individual Defendants caused CHCO to increase its investment in the high risk loan market by approving the acquisition of an originator of high loan-to-value, junior lien loans and other high risk loans ("sub-prime loans") in California. Sub-prime loans were generally used by borrowers to finance improvements to property or to consolidate other debt, such that little or no collateral secured the loans. Sub-prime loans are high risk and the bank had little or no experience or expertise in the area.

48. In 1998, CHCO initiated sub-prime loan origination in West Virginia and further expanded its operations in California by forming a loan origination platform in southern California.

49. By this time, CHCO was actively soliciting potential borrowers through direct mail and telemarketing for its loan origination division. In addition to these origination activities, however, CHCO further increased its investment in this market by initiating a program to purchase existing sub-prime loans from a network of correspondent lenders nationwide, and CHCO quickly became a substantial holder of sub-prime loans.

50. In June 1998, CHCO invested approximately $10 million in Mego Mortgage Corporation, later known as Altiva Financial Corporation ("Altiva"), a specialty financial services company in Atlanta, Georgia, that originated and acquired sub-prime loans. Despite its substantial investment, CHCO imprudently structured its investment and failed to obtain a secure ownership position.

51. Although, the sub-prime market was clearly in decline by mid-1998, CHCO further invested in its sub-prime loan business by opening an additional loan origination platform in Dallas, Texas, in August 1998.

52. As a part of CHCO's mortgage banking program related to sub-prime loans, CHCO also began to securitize its sub-prime loans, pooling and selling the bulk of its loans and retaining residual interests in the securitized loan pools as assets. This was one way in which CHCO attempted to mitigate the risks inherent in the sub-prime loan market.

53. CHCO raised capital by issuing preferred shares to finance the acquisition of its retained interest in the securitized loans. Less than three years later, CHCO was ordered by federal banking regulators not to pay dividends to the holders of these preferred shares until at

least 2002 due to its poor financial condition, causing CHCO to default on an obligation of $5.3 million to these shareholders.

54. Acknowledging the risk involved in the sub-prime loan industry, the CHCO Board of Directors stated in its 1998 Annual Report that "risks associated with the junior lien mortgage pool [include] credit risk related to the quality of the underlying loan and the borrower's financial capability to repay the loan, market risk . . . and interest rate risk." However, as illustrated by the devastating losses suffered by CHCO in the sub-prime market in 1999 and 2000, the CHCO Board misstated in that Annual Report that CHCO "manages this risk by continuously improving policies and procedures designed to reduce the risk of loss." In fact, CHCO's management team and Board failed entirely to manage the risk inherent in the sub-prime loan business.

55. In 1999, CHCO was forced to take a $10 million charge against earnings as a result of the decline in fair market value of CHCO's investment Altiva. This write-off represented a total loss of CHCO's $10 million investment in Altiva, which took place just a year earlier, in June 1998.

56. Also in 1999, CHCO's income from mortgage operations decreased by over 30 percent, leading to a total loss of over $10.2 million in the mortgage banking segment. In 2000, CHCO similarly suffered a $22.9 million loss in its mortgage banking division.

57. The management team also mismanaged the securitization of sub-prime loans in 1998 and 1999. In 1998, CHCO's management and Board stated in the Annual Report that "[m]anagement monitors the actual default and prepayment rates of each securitized pool on a monthly basis . . . to ensure the rates used to estimate the retained interest are still reasonable." However, CHCO management failed to properly supervise the securitization and management of

retained interests and substantial losses became apparent. As a result, by the end of 1999, CHCO had recorded a charge of over $21 million against earnings in 1999 to reduce the fair market value of CHCO's total retained interests in securitized mortgage pools.

58. Also in 1999, federal banking regulators cited CHCO management in 1999 for its weak oversight over its activities in this high risk industry and its failure to comply with OCC regulations on loan securitization.

59. In the second quarter of 1999, CHCO acknowledged its losses in this market and publicized its intention to divest all of its sub-prime loan businesses. At that time, CHCO estimated taking a loss of $2 to $5 million as a result of the sale of these businesses. By the end of 1999, however, CHCO had taken the $10 million charge in connection with Altiva, and, in 2000, CHCO took a charge of $15.18 million against earnings in connection with its efforts to exit the sub-prime loan business.

60. In the most recent blow to the sub-prime loan securitization business, CHCO took a charge of almost $30 million against earnings in early 2001 in order to reflect continued decline in the value of CHCO's retained interests in the securitized sub-prime loans.

**Non-Banking Businesses:**

61. In 1998, CHCO imprudently acquired several non-banking businesses in which it had little or no experience or expertise. CHCO has lost millions of Dollars as a result of these acquisitions.

62. In or about January 1998, CHCO acquired a direct mail marketing company, Jarrett Aim Communications, Inc., to provide direct mail and marketing services for CHCO and third parties.

63. The Individual Defendants, in their role as officers and Directors of CHCO and City National, failed to exercise appropriate care and oversight over the acquisition.

64. In late 1997, CHCO acquired an insurance brokerage business RMI, Ltd. ("RMI"). RMI was sold to CHCO by its prior owner, David Haden, who was also, at the time of the transaction, a member of the CHCO Board of Directors. The Individual Defendants, in their role as officers and Directors of CHCO and City National, failed to exercise appropriate oversight over this acquisition, in which at least one member of the Board of Directors, David Haden, was an interested party.

65. In or about April 1998, CHCO acquired two internet services providers, Citynet Corporation and MarCom, Inc., which were consolidated into Citynet, a division of City National, that was to provide internet services and web page design services to CHCO, City National and third parties.

66. The Individual Defendants, in their role as officers and Directors of CHCO and City National, failed to exercise appropriate care or oversight over this acquisition.

67. For the purposes of its financial statements, CHCO consolidated these ventures into its "Other Financial Services" division.

68. The above acquired businesses lost millions of Dollars. In 1997, before the relevant acquisitions, CHCO earned a profit of $47,000 in its "other financial services" division. In 1998, the division lost $297,000, followed by losses of $1.66 million in 1999 and $6.6 million in 2000.

69. In 2000, CHCO was forced to take a charge against earnings of over $6 million in order to write down the value of these non-banking businesses.

70. The internet services business and direct mailing company were sold in 2001.

71. Upon information and belief, CHCO has imprudently invested in and/or acquired other non-banking businesses and suffered significant losses as a result.

**Sweetheart Deals for Directors and Officers:**

72. Although it was apparent that Day and his managers were not competent to manage CHCO, the CHCO Board on December 31, 1998 gave them new lucrative long-term contracts with terms extremely favorable to Day and his managers.

73. Between June 2000 and spring 2001, Day and his two top managers left CHCO. Despite their pervasive mismanagement of the company's activities and finances between 1998 and 2000, all three received generous severance packages, anticipated to cost CHCO millions of Dollars over a period of approximately five years.

74. Individual Defendant Day's employment was terminated in June 2000 after a "no confidence" vote by the CHCO Board.

75. Although the company took the position in June 2000 that Day's employment was terminated after a no confidence vote by the CHCO Board, the Board later agreed to classify Day's departure as a "termination without just cause," resulting in Day's receiving a generous severance package including the guarantee of $294,000 in annual salary for five years, plus health insurance and a car.

76. Individual Defendant Henson and Individual Defendant Call resigned their employment in spring 2001.

77. The severance packages of Henson and Call were dependent on the amount of compensation earned in their final year of employment. In order to enhance their severance packages, the Board awarded substantial bonuses to Henson and Call for the year 2000, despite

(1) Henson and Call's extensive participation in the misconduct alleged herein and (2) CHCO's significant financial losses that year.

78. As a result, Henson is to receive $135.000 for five years and Call received a lump sum of over $200,000 in 2001, with continuing annual payments between $63,000 and $127,000 until 2005.

79. The substantial payouts were made to Day, Henson and Call despite the catastrophic losses suffered by CHCO and the three individuals' management responsibility therefore.

**Count I - Breach of Fiduciary Duty**
**(Against all Individual Defendants)**

80. Plaintiff realleges and incorporates by reference paragraphs 1 through 79 above as if fully set forth herein.

81. The Individual Defendants owed to CHCO, City National and CHCO's shareholders the highest duties of loyalty, honesty and care in conducting the affairs of CHCO and City National. To discharge these duties, each Individual Defendant was obligated to exercise reasonable and prudent supervision and oversight over the management, systems, control and financial affairs of CHCO and City National and make informed decisions designed to ensure the safety and soundness of the bank.

82. The Individual Defendants who were officers of CHCO and/or City National acted negligently, recklessly and/or intentionally in disregard of their fiduciary duties as officers in their gross mismanagement of CHCO's and City National's business activities so that they may be held personally liable for the alleged wrongs.

83. The Individual Defendants who were directors of CHCO and/or City National acted negligently, recklessly and/or intentionally in disregard of their fiduciary duties of care and loyalty in their oversight of the management of CHCO and City National, including but not limited to their failure: (1) to inform themselves properly regarding the acquisitions and investments by CHCO and City National, (2) to properly oversee loans made and acquired by CHCO and City National, (3) to recognize warning signs and take appropriate action in connection with the mismanagement of CHCO and City National, (4) to hire competent management, (5) to ensure that properly functioning internal controls were in place, and (6) to discharge their oversight, strategic planning and business development duties. Therefore, they may be held personally liable for the alleged wrongs.

84. All Individual Defendants, by their conduct, have caused CHCO and City National to suffer monetary damages and have exposed CHCO and City National to extensive investigation and supervision by federal banking regulators.

85. Accordingly, plaintiff, as a shareholder of CHCO and thus City National, seeks on behalf of those entities monetary damages, injunctive remedies and other forms of relief.

**Count II - Negligence**
**(Against all Individual Defendants)**

86. Plaintiff realleges and incorporates by reference paragraphs 1 through 79 above as if fully set forth herein.

87. The Individual Defendants owed to CHCO, City National and CHCO's shareholders a duty of care in conducting the affairs of CHCO and City National. To discharge this duty, each Individual Defendant was obligated to exercise reasonable and prudent

supervision and oversight over the management, systems, control and financial affairs of CHCO and City National and make informed decisions designed to ensure the safety and soundness of the bank.

88. The Individual Defendants who were officers of CHCO and/or City National acted negligently, recklessly and/or intentionally in disregard of their fiduciary duties as officers in their gross mismanagement of CHCO's and City National's business activities so that they may be held personally liable for the alleged wrongs.

89. The Individual Defendants who were directors of CHCO and/or City National acted negligently, recklessly and/or intentionally in disregard of their duties of care and loyalty in their oversight of the management of CHCO and City National, including but not limited to their failure: (1) to inform themselves properly regarding the acquisitions and investments by CHCO and City National, (2) to properly oversee loans made and acquired by CHCO and City National, (3) to recognize warning signs and take appropriate action in connection with the mismanagement of CHCO and City National, (4) to hire competent management, (5) to ensure that properly functioning internal controls were in place, and (6) to discharge their oversight, strategic planning and business development duties. Therefore, they may be held personally liable for the alleged wrongs.

90. All Individual Defendants, by their conduct, have caused CHCO and City National to suffer monetary damages and have exposed CHCO and City National to extensive investigation and supervision by federal banking regulators.

91. Accordingly, plaintiff, as a shareholder of CHCO and thus City National, seeks on behalf of those entities monetary damages, injunctive remedies and other forms of relief.

**Count III - Breach of Contract**
**(Against Individual Defendants Day, Henson and Call)**

92. Plaintiff realleges and incorporates by reference paragraphs 1 through 91 above as if fully set forth herein.

93. Individual Defendants Day, Henson and Call were officers of CHCO.

94. In connection with being appointed to their positions as officers of CHCO, Day, Henson and Call each entered into a contract of employment with CHCO (collectively the "Contracts").

95. The Contracts required that Day, Henson and Call each perform their job duties and responsibilities in a way that is generally acceptable in the banking industry for their respective positions.

96. Day, Henson and Call failed to perform their job duties and responsibilities as required by their Contracts and with ordinary care and prudence and therefore materially breached their respective Contracts with CHCO.

97. CHCO has suffered significant damages as a result of the breaches by Day, Henson and Call.

**WHEREFORE,** plaintiff requests relief in the form of judgment:

> ordering the Individual Defendants, jointly and severally, to pay to CHCO the amounts to be determined at trial by which it has been damaged or will be damaged by reason of the conduct alleged herein;
>
> ordering the Individual Defendants Day, Henson and Call to remit to CHCO and/or City National any compensation paid to them after their date of termination;
>
> ordering that the Individual Defendants and those under their supervision and control refrain from further violations as are

alleged herein and to implement corrective measures including a system of internal controls and procedures sufficient to prevent repetition of the acts complained of herein;

awarding pre-judgment and post-judgment interest as allowed by law;

awarding plaintiff's attorneys' fees, expert fees and other reasonable costs and expenses as well as a reasonable amount to compensate plaintiff for his time and effort in prosecuting this suit; and,

granting such other and further relief as this Court may deem just and proper.

**A JURY TRIAL DEMANDED.**

**<u>SCOTT W. ANDREWS</u>**
BY COUNSEL,

Guy R. Bucci (State Bar No. 521)
Timothy C. Bailey (State Bar No. 5839)
BUCCI, BAILEY & JAVINS, L.C.
707 Virginia Street, East, Suite 910
Charleston, WV 25301
(304) 345-0346 (phone)
(304) 345-0375 (fax)

Carl S. Kravitz (State Bar No. 7361)
ZUCKERMAN SPAEDER LLP
1201 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 778-1800 (phone)
(202) 822-8106 (fax)

01 DEC 28 AM 11: 23

**VERIFICATION**

SCOTT W. ANDREWS, being duly sworn, deposes and says:

I am the Plaintiff named in the foregoing Verified Derivative Complaint. I have read the foregoing Verified Derivative Complaint and know the contents thereof. To the best of my knowledge, information and belief, the allegations set forth herein are true and correct. My information and belief is based upon documents publicly filed by CHCO and City National, press releases and articles, and my independent investigation and the independent investigation of my retained counsel.

SCOTT W. ANDREWS

Executed before me this 26th day of December, 2001, in my capacity as a Notary Public in and for the State of West Virginia.

My Commission expires August 4, 2003.

[SEAL]

NOTARY PUBLIC

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
KELLI J. BRADY
6036 1/2 BAKER ROAD
HUNTINGTON, WV 25705
My Commission Expires AUG. 4, 2003